## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DS-CONCEPT TRADE INVEST LLC,<br><br>*Plaintiff,*<br><br>v.<br><br>ATALANTA CORPORATION, GORMET<br>FOOD IMPORTS LTD and GOURMET<br>FOOD IMPORTS, LLC,<br><br>*Defendants.* | Civil Action No. 16-CV-429 (SRC)(CLW)<br><br><br>**FINAL PRETRIAL ORDER** |

This matter having come before the Court for a pretrial conference pursuant to Fed. R. Civ. P. 16; Mandelbaum Barrett PC having appeared for Plaintiff DS-Concept Trade Invest LLC ("DS-Concept" or "Plaintiff") and Thompson Coburn Hahn & Hessen LLP having appeared for Defendant Atalanta Corporation ("Atalanta" or "Defendant"); and counsel all having been notified that:

(1)  a jury trial in this matter has been scheduled before the Honorable Stanley R. Chester, U.S.D.J. date to be set by His Honor's Chambers; and

(2)  unless otherwise noted herein, the pretrial submissions detailed in ¶ 2 below are to be submitted no later than 180 days from the date of this Order or 60 days prior to trial, whichever is sooner, unless otherwise noted herein or they will be deemed waived; and the following Final Pretrial Order is hereby entered:

**1.     Jurisdiction**

This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1332(a) in that all parties are citizens of different states and the amount in controversy exceeds $75,000.00.

1

2.     **Pending/Contemplated Motions**

There are no submitted motions currently pending the Court's decision.

A.     DS-Concept contemplates that it will file motions *in limine* for the following relief:

   i.    *Daubert* Motion to Exclude Testimony of Atalanta's Expert Witness Don Coker. DS-Concept intends to file a *Daubert* motion to preclude Mr. Coker from testifying at trial for Atalanta as an expert witness on the factoring industry.

   ii.   *In Limine* Motion to Exclude All Evidence Related to Cheese Non-Conformity Defense. DS intends to file an *in limine* motion to preclude Atalanta from introducing evidence to support its affirmative defense under the UCC that the Pecorino cheese at issue was non-conforming based on its milk content.

   iii.  *In Limine* Motion to Exclude Testimony or Reference by Atalanta to Double Payment, Paying Twice, Or Similar Commentary. DS-Concept intends to file an *in limine* motion to preclude Atalanta from eliciting testimony or referencing "double payment," "paying twice," or any similar language in relation to the consequence of Atalanta directly paying Gourmet on the Paid Invoices (as defined below).

   iv.   *In Limine* Motion to Exclude Testimony or Reference by Atalanta to Debt Owed by Gourmet to DS-Concept. DS-Concept intends to file an *in limine* motion to preclude Atalanta from eliciting testimony, introducing evidence, or referencing any debt that Gourmet owes to DS-Concept.

   v.    *In Limine* Motion to Exclude Testimony or Reference by Atalanta to Obligation to Pay Only Invoices DS-Concept Financed. DS-Concept intends to file an *in limine* motion to preclude Atalanta from eliciting testimony, introducing evidence, or advancing any narrative that Atalanta only had to pay DS-Concept on invoices that Gourmet presented to DS-Concept for financing.

   vi.   *In Limine* Motion to Exclude Testimony or Reference by Atalanta to Default Judgment Against Gourmet and Tim Jikovski ("Jikovski"). DS-Concept intends to file an *in limine* motion to preclude Atalanta from eliciting testimony, introducing evidence, or referencing the default judgment that it obtained in this case against Gourmet and Jikovski.

   vii.  *In Limine* Motion to Exclude Testimony or Reference by Atalanta to California Litigation. DS-Concept intends to file an *in limine* motion to preclude Atalanta from eliciting testimony, introducing evidence, or referencing any litigation in California.

      viii.       *In Limine* Motion to Exclude Testimony or Reference by Atalanta to Trade Finance. DS-Concept intends to file an *in limine* motion to preclude Atalanta from eliciting testimony, introducing evidence, or referencing any alleged "trade financing" between Atalanta and Gourmet.

B.     Atalanta contemplates that it will file motions *in limine* for the following relief:

    i.       Motion *in limine* to preclude the use of or reference to the deposition testimony of Jikovski at trial.

    ii.      Motion *in limine* to preclude the use of or reference to the deposition testimony of Mark Mazzella at trial or any reference at trial to Mazzella's invocation of the Fifth Amendment right against self-incrimination before or during his deposition in this matter or at any other time thereafter;

    iii.     Motion *in limine* to preclude the use of or reference at trial to Atalanta's revenues, profits, or assets, including the revenues, profits, and assets of Atalanta's corporate parent and affiliates;

    iv.     Motion *in limine* to preclude the use of or reference at trial to any claim Atalanta made with any insurance carrier, including without limitation communications between Atalanta's counsel and any insurance carrier of Atalanta regarding the events underlying this action or any claim Atalanta made with any such insurance carrier and proofs of such claims;

    v.      Motion *in limine* to preclude any reference to, description of, examination of witnesses that claims, inference of, or argument that non-negotiable bills of lading as title documents that establish ownership of the goods identified therein.

    vi.     Motion *in limine* to preclude the use of or reference at trial to the amount attorneys' fees and costs of Plaintiff, including but not limited to the fees and costs expended in connection with its efforts to secure, litigate certain issues concerning, and liquidate the cheese product (the "Product") identified in the 14 invoices in dispute here and identified in Plaintiff's Amended Complaint (the "14 Invoices").

All remaining pretrial motions shall be filed as of the date(s) specified in this Order, and any response(s) shall be submitted no later than fifteen business days of the date such motion(s) are filed.  Only those motions listed herein will be entertained prior to trial.

3.    **Stipulation of Facts**[1]

DS-Concept and Atalanta stipulate that the following facts are uncontested:

A.    <u>The Parties' Dealings</u>

    i.    Atalanta began purchasing product from Gourmet in about 2010.

    ii.    At all relevant times, DS-Concept was a finance company in the business of offering factoring and other alternative finance products.

    iii.    At all relevant times, Gormet Food Imports Ltd. ("Gormet Ltd.") was an exporter and distributor of food products located in Bulgaria that conducted business in other European countries as well.

    iv.    At all relevant times, Defendant Gourmet Food Imports, LLC ("Gourmet LLC" and, together with Gormet Ltd., "Gourmet"), a Nevada corporation with a principal place of business in California, was an importer and distributor of food products located in California.

    v.    Gormet Ltd. and Gourmet LLC were at all relevant times presented as affiliated companies.

    vi.    Gourmet was an authorized supplier to Atalanta in 2013, 2014, 2015, and 2016 and was given Atalanta supplier code S1080.

    vii.    Mark Mazzella ("Mazzella") was responsible for the Gourmet account until his resignation from Atalanta.

    viii.    Atalanta placed orders for cheese product from Gourmet.

    ix.    Atalanta's last order for cheese product from Gourmet took place in about March of 2016.

B.    <u>Atalanta's Payments on Gourmet Invoices</u>

    i.    Between August 2013 through the end of 2015, certain of Atalanta's purchase orders to Gourmet instructed Gourmet to "send all paperwork prior to the container arrival date[.]"

    ii.    At all relevant times, to obtain financing of an invoice to Atalanta, Gourmet would send the invoice and, typically, each corresponding bill of lading, to DS-

---

[1] By stipulating to the facts stated herein, neither party waives any argument regarding the relevance, admissibility, or legal effect or conclusion to be drawn from any such stipulated fact. Additionally, the parties' stipulation of facts does not waive or in any way limit the parties' ability to file any indicated pretrial motion, and any relief granted pursuant to those filed motions will apply regardless of the parties' stipulations of facts herein.

Concept Factoring, Inc. ("Factoring") and request that Factoring send same to Atalanta.

iii.   Factoring would then send such Gourmet invoice and, typically, the bill of lading to Atalanta, asking for it to confirm or verify each such invoice.

iv.   Atalanta would then review the invoice about which Factoring contacted it.

v.   After Atalanta received the goods provided for on an invoice from Gourmet, an Atalanta product manager would approve payment of the invoice.

vi.   Atalanta thereafter made payments on Gourmet invoices.

C.   Mark Mazzella and the Gourmet Account

i.   Mazzella commenced employment at Atalanta on August 16, 1994.

ii.   In 2008, Mazzella was promoted from product manager to senior product manager in Atalanta's cheese and specialty deli department.

iii.   Mazzella had sales responsibility, purchasing responsibility, inventory management, supplier relationship responsibility, and identified new categories of product.

iv.   Mazzella was responsible for maintaining and examining inventory.

v.   When Mazzella was promoted to senior product manager, a team of employees at Atalanta became available to provide Mazzella support.

vi.   Mazzella was the only Atalanta product manager responsible for buying cheese from Gourmet during the time Mazzella was employed by Atalanta.

vii.   In 2014, Atalanta placed an order with Gourmet for pecorino grating cheese.

viii.   This product ordered in 2014 and listed in the 14 Invoices was made in Macedonia.

D.   The Fourteen Invoices in Dispute

i.   The 14 Invoices in dispute bear the following details:

| Invoice No. | Invoice Date | Amount |
|---|---|---|
| 59104 | June 16, 2015 | $189,817.63 |
| 59105 | June 16, 2015 | $189,358.02 |
| 59106 | June 16, 2015 | $189,435.24 |

| 59107 | June 23, 2015 | $189,331.45 |
|-------|---------------|-------------|
| 59108 | June 23, 2015 | $189,290.23 |
| 59109 | June 23, 2015 | $189,370.15 |
| 59112 | July 16, 2015 | $189,961.59 |
| 59113 | July 16, 2015 | $189,839.30 |
| 59114 | July 16, 2015 | $190,098.61 |
| 59117 | July 29, 2015 | $185,300.96 |
| 59118 | July 29, 2015 | $184,817.95 |
| 59119 | July 29, 2015 | $185,059.30 |
| 59120 | August 3, 2015 | $185,059.30 |
| 59121 | August 3, 2015 | $185,059.30 |
|  | **TOTAL** | **$2,631,799.03** |

     ii.    DS-Concept has demanded that Atalanta make payment on the 14 Invoices.

     iii.    Atalanta has claimed it is not liable to pay any portion of the 14 Invoices.

E.    <u>The Paid Invoices</u>

     i.    In 2015 and 2016, Atalanta paid Gourmet on eleven invoices (the "Paid Invoices").

     ii.    The particulars of the Paid Invoices are as follows:

| **Invoice No.** | **Invoice Date** | **Amount** |
|-----------------|------------------|------------|
| 50150 | 5/12/15 | $62,000.00 |
| 50151 | 9/15/15 | $48,346.84 |
| 50152 | 10/21/15 | $72,838.48 |
| 50155 | 10/23/15 | $68,544.33 |
| 50156 | 11/6/15 | $60,928.33 |

6

| 50157 | 11/20/15 | $73,355.98 |
|-------|----------|------------|
| 50158 | 11/27/15 | $71,028.03 |
| 50159 | 12/4/15 | $48,000.00 |
| 50160 | 12/4/15 | $62,000.00 |
| 50164 | 1/20/16 | $66,840.98 |
| 50165 | 2/4/16 | $64,321.83 |
| | **TOTAL** | **$698,204.80** |

    iii.   DS-Concept has demanded that Atalanta make payment to it on the Paid Invoices.

    iv.   Atalanta has claimed it is not liable to pay any portion of the Paid Invoices to DS-Concept.

F.    The 2016 Invoices

    i.   After DS-Concept commenced this litigation on January 25, 2016, Atalanta ordered additional cheese product from Gourmet.

    ii.   In early 2016, Atalanta received cheese product from Gourmet.

    iii.   For this cheese product, Gourmet issued three invoices to Atalanta (the "2016 Invoices").

    iv.   The particulars of the 2016 Invoices are as follows:

| **Invoice No.** | **Invoice Date** | **Amount** |
|-----------------|------------------|------------|
| 50166R | 2/12/16 | $56,028.75 |
| 5016R | 2/22/16 | $83,792.51 |
| 50171 | 3/28/16 | $49,650.00 |
| | **TOTAL** | **$189,471.26** |

    v.   DS-Concept has demanded that Atalanta make payment to it on the 2016 Invoices.

      vi.     Atalanta has claimed it is not liable to make payment on the 2016 Invoices to DS-Concept or Gourmet.

**4.**      **Judicial Notice: Plaintiff**

DS-Concept requests that the Court take judicial notice of the following facts: None.

**5.**      **Judicial Notice: Defendant**

      A.     Atalanta requests that the Court take judicial notice of the following facts:

      i.     The Port of Thessaloniki, Greece is approximately 6,580 miles from the Port of Oakland, California.

      ii.     North Macedonia, formerly known as the Republic of Macedonia, was not a member of the European Union from 2014 through 2016.

      iii.     Gourmet and Jikovski are indebted to Atalanta pursuant to a judgment dated December 16, 2019 (the "Gourmet Judgment") in the principal amount of $1,404,520.70, plus accrued and accruing post-judgment interest, in part on Atalanta's claim for breach of contract for delivery of non-conforming goods (*see* D.E. 186, 201, 230).

      B.     DS-Concept objects to the taking of judicial notice for the following reasons:

      i.     DS-Concept objects to Atalanta's request to take judicial notice of the default judgment point (iii) only insofar as Atalanta seeks for the judicial notice to have any bearing or legal consequence to liability or damages at trial or post-trial.

**6.**      **DS-Concept's Contested Facts**

Proof shall be limited at trial to the matters set forth below.  Failure to set forth any matter shall be deemed a waiver thereof.

      A.     DS-Concept intends to prove the following contested facts with regard to liability:

      1.     DS-Concept has standing to pursue its claims against Atalanta.

      2.     On or about July 29, 2013, Gormet Ltd. entered into an Account Receivable Purchase Agreement with DS-Concept.

      3.     On or about August 5, 2013, Gourmet LLC entered into an Account Receivable Purchase Agreement with DS-Concept.

4.     The terms and provisions of these two agreements are identical, other than the name of the parties.

5.     The Factoring Agreement provides that DS-Concept was purchasing and Gourmet was assigning to DS-Concept all of Gourmet's invoices.

6.     In or about August 2013, Gourmet sent two written notifications (collectively, the "Notice" or "Notice of Assignment") to Atalanta advising Atalanta that Gourmet entered into accounts receivable purchase agreements.

7.     After Gourmet sent the Notice of Assignment to Atalanta, the Notice of Assignment was circulated and discussed via email among numerous executives and employees of Atalanta, including, but not limited to, Andy Gellert ("A. Gellert"), Atalanta's President, Charlie Stough ("Stough"), who at the time was Atalanta's soon to be departing CFO, Tom DeCarlo ("DeCarlo"), who was hired to replace Stough as Atalanta's CFO, Mazzella, Sadina Atchison ("Atchison"), a supply chain analyst who worked directly under Mazzella on the Gourmet account, Steve Sorahan ("Sorahan"), Atalanta's Director of Accounting and Ruby Collantes ("Collantes"), Atalanta's employee responsible for executing wire transfers to vendors who reported to the CFO.

8.     The Notice of Assignment forbade Atalanta from making payments on any Gourmet invoices directly to Gourmet.

9.     Pursuant to the Notice of Assignment, Atalanta was required to pay DS-Concept for all Gourmet invoices by remitting payment to a bank account in the name of Special.

10.    Despite Atalanta executives and personnel receiving, review, understanding, and acknowledging the Notice of Assignment, Atalanta took no internal steps to make sure Gourmet invoices were paid consistent with the Notice of Assignment.

11.    Mazzella was a Senior Product Manager at Atalanta.

4884-3141-4357, v. 1

12.     Mazzella supervised and was responsible for the employees on his team.

13.     Atalanta named Mazzella Product Manager of the Year for the year 2014.

14.     Mazzella's total compensation received from Atalanta in 2015 was $238,563.52.

15.     On Atalanta's behalf, Mazzella would approve payment of each confirmed or verified Gourmet invoice, and Atalanta would then pay the invoice.

16.     Mark Mazzella was responsible for the Gourmet account and was thus the product manager for Atalanta who most often approved payment of Gourmet invoices.

17.     Prior to May 18, 2015, Atalanta would make payment on Gourmet invoices to DS-Concept by remitting payment to a bank account owned by Special.

18.     Atalanta's 2014 order of Pecorino grating cheese that it ordered in 2014 was made in Macedonia as identified in the applicable bills of lading and certificates of analysis and other related shipping documents provided to Atalanta.

19.     On or about May 18, 2015, Factoring, DS-Concept's servicer, notified Atalanta of a change in payment direction of the bank account Atalanta should make payment to and, as a result of such notice, Atalanta was required to remit payment to ITF on all further Gourmet invoices.

20.     After acknowledging the Notice of Assignment and understanding that Gourmet invoices are to be paid to Special and then as instructed by Factoring, DS-Concept's servicer, to make payments to ITF, Atalanta ignored the Notice of Assignment and notice of change in payment direction and simply paid Gourmet invoices based on whatever instruction was set forth in any Gourmet invoice.

21.     Atalanta's practice concerning Gourmet's invoices was to pay each Gourmet invoice as specifically directed in each such invoice after it obtained payment approval from

10

Mazzella, Atalanta's product manager responsible for the Gourmet account, irrespective and without regard to the Notices.

22.    Mazzella had the autonomy and discretion to sell cheese to either new customers or old customers.

23.    Mazzella had the ability to purchase cheese from suppliers.

24.    Mazzella had the ability to source new products and suppliers and purchase products from these suppliers.

25.    Mazzella had autonomy to purchase cheese from suppliers.

26.    Mazzella could issue purchase orders.

27.    Mazzella's direct supervisor, John Rodger ("Rodger"), was not required to approve purchase orders.

28.    After Mazzella was authorized to purchase a certain type of cheese, he had the sole discretion to continue to buy that particular type of cheese without any further need to obtain any approval from his supervisor.

29.    Mazzella was authorized on behalf of Atalanta to purchase all the cheese that is the subject matter of this litigation.

30.    Mazzella was responsible for initiating Atalanta's purchases of cheese from Gourmet and did not purchase pecorino grating cheese from any suppliers other than Gourmet.

31.    Atalanta never independently tested the composition or quality of any of the cheese it purchased from Gourmet.

32.    Nor did Atalanta ever take any issue with the quality or composition of any cheese that it purchased from Gourmet. The first issue Atalanta ever raised in this regard was by counterclaim in the midst of this present lawsuit.

33.     From August 2013 through the end of 2015, Atalanta paid DS-Concept affiliates, Special and ITF, more than $8.4 million on 74 Gourmet invoices.

34.     All Bills of Lading for cheese purchased by Atalanta from Gourmet identified Atalanta as the Consignee.

35.     In the summer of 2015, Atalanta wanted to increase its purchases of pecorino grating cheese from Gourmet, and there were meetings and communications between Atalanta, Gourmet, and DS-Concept about this.

36.     Thereafter, Atalanta, through Mazzella, purchased all the cheese represented on the 14 Invoices.

37.     The product listed in the 14 Invoices was manufactured in Macedonia.

38.     Atalanta would confirm, verify, or approve purchases of cheese from Gourmet. Specifically, Atalanta would respond Factoring by email and advise Factoring, in substance, that the invoice about which Factoring contacted Atalanta was confirmed, verified, or approved.

39.     At the time Atalanta responded to Factoring to advise that the Gourmet invoices were confirmed, verified, or approved, the product listed in such invoice was not located in the United States.

40.     DS-Concept would then incrementally fund to Gourmet such that Gourmet was paid 80% of the face value of all unpaid invoices at the time of each funding.

41.     Atalanta, through Mazzella and/or Atchison, verified and confirmed to Factoring that each of the 14 Invoices were legitimate purchases from Gourmet.

42.     As a result of Atalanta's confirmation of the 14 Invoices, DS-Concept advanced monies to Gourmet.

43.     Gourmet was Atalanta's agent to receive and take possession of all of the cheese identified in the 14 Invoices.

44.     As to the 14 Invoices, after they became due, Atalanta, through Mazzella, confirmed that it received and did not reject the cheese represented by the 14 unpaid invoices.

45.     Thereafter, Atalanta, through Mazzella, agreed to a payment plan for the 14 Invoices.

46.     Atalanta never informed Gourmet or DS-Concept that any of the cheese set forth in the 14 Invoices was nonconforming.

47.     On December 23, 2015, Atalanta issued a bill of sale for the cheese represented in the 14 Invoices with Mazzella, senior product manager at Atalanta in charge of the Gourmet account, transferring ownership of such cheese to Gourmet.

48.     Mazzella's last day of employment with Atalanta was December 23, 2015.

49.     Atalanta made direct payments to Gourmet on the Direct Payment Invoices in violation of the Notice of Assignment.

50.     Atalanta failed to make any payment on the 2016 Invoices, in violation of the Notice of Assignment.

51.     Atalanta filed an insurance claim with GAIC under its crime/fraud protection policy B1 (Employee Honesty) and B2 (Forgery and Alteration) related to Mazzella's management of the Gourmet account and DS-Concept's claims in this lawsuit. In support of its insurance claim, on November 10, 2017, Atalanta's litigation counsel, Zachary Newman, Esq., on Atalanta's behalf, submitted a proof of loss to GAIC. Atalanta's Vice President, Thomas Gellert ("T.Gellert"), made the following certified statement as part of the proof of loss:

> Atalanta sustained a very substantial loss due to the fraud, forgery
> and dishonesty of former Atalanta product manager Mark Mazzella

("Mazzella"). Mazzella colluded with Tim Jikovski "(Jikovski)", the president of Atalanta vendor Gourmet Food Imports, LLC ("Gourmet"), to cause Atalanta to order and pay for "pecorino" cheese from Gourmet that was either (a) inferior or adulterated product, (b) overpriced, and/or (c) not reasonably needed or required to fulfill any legitimate business need of Atalanta. Mazzella did so while receiving payments and other consideration from Jikovski, and he ultimately resigned from Atalanta for a lucrative position at Gourmet with benefits. As is more detailed in Atalanta's court filings (which are incorporated hereby by reference), Mazzella forged and altered existing Atalanta purchase orders so they appeared to order product from Gourmet, created fraudulent Atalanta purchase orders for product from Gourmet and "approved" fraudulent Gourmet invoices. Through this fraud, Gourmet earned millions of dollars in revenue and (a) left Atalanta with an oversupply of worthless product; (b) subjected Atalanta to liability from Gourmet's lender on fabricated invoices Mazzella confirmed that he knew reflected product that was never intended or delivered to Atalanta, and (c) otherwise received funds that other parties claim should have been paid to them directly.

The Hahn and Hessen LLP letter dated November 10, 2017, with attachments, supplements and supports this claim and its incorporated herein by reference. These attachments include: (1) excerpts of Gourmet's banking records and revealing payment of tens of thousands of dollars Gourmet and Jikovski to Mark Mazzella directly or indirectly (through a company he controls); (2) excerpts from the transcript of Mazzella's recent deposition, and (3) copies of documents, invoices and forgeries/alterations at issue.

52.   Atalanta has not commenced civil litigation against Mazzella.

53.   Atalanta has not made a criminal complaint against Mazzella.

54.   Special and ITF are affiliates and assignees of DS-Concept.

55.   DS-Concept ultimately reported the 14 Invoices to its credit insurer, Euler Hermes.

B.    DS-Concept intends to prove the following contested facts with regard to damages:

1.    Atalanta is liable to DS-Concept in the amount of $2,631.799.3 representing the amount owed on the 14 Invoices because Atalanta ordered the cheese, verified, and confirmed to DS-Concept that it had ordered the cheese, and received and did not reject the cheese. Further, Atalanta agreed to a payment plan for the 14 Invoices.

14

2.      Atalanta is liable to DS-Concept in the amount of $698,204.80 representing the Direct Payment Invoices, pursuant to the Notice of Assignment and Factoring's notice of the change in payment direction to ITF required that these invoices not be paid to Gourmet but to Special and, then, after May 18, 2015, to ITF.

3.      Atalanta is liable to DS-Concept in the amount of $189,471.29 representing the 2016 Invoices, pursuant to the Notice of Assignment and Factoring's notice of the change in payment direction to ITF required that these invoices not be paid to Gourmet but to Special and, then, after May 18, 2015, to ITF.

**7.    Atalanta's Contested Facts**

Proof shall be limited at trial to the matters set forth below.  Failure to set forth any matter shall be deemed a waiver thereof.[2]

A. Atalanta intends to prove the following contested facts with regard to liability:

i.      With respect to Plaintiff's claims concerning the 14 Invoices (Counts One Through Five):

a.      Atalanta disputes having any responsibility to pay for any produced identified in the 14 Invoices for numerous reasons, including, for example, that the Product was never delivered to Atalanta, Gourmet received and sold the Product for its own and Plaintiff's benefit, the Product was never supported by a legitimate Plaintiff purchase order, the Product was adulterated and non-conforming to Atalanta's standards, and Plaintiff understood the 14 Invoices were earmarked for sale by Gourmet to its other customers, not Atalanta. Most simply, Plaintiff cannot prove delivery of the Product to Atalanta, as Atalanta was only responsible for payment of any product from Gourmet after physical delivery of conforming goods, and thus Plaintiff cannot recover against Atalanta.

b.      Atalanta was not required to, and would not, make payment on any Gourmet invoice until Atalanta had physically received the goods at the agreed location.  Neither Gourmet nor Plaintiff ever required

---

[2] For the convenience of the Court and the parties, Atalanta organizes its statement of contested facts by reference to Plaintiff's claims.  In so doing, Atalanta does not contend that any contested fact is only applicable to the subheading under which it falls or limit its ability to prove any contested fact to establish liability, damages, or a defense to any or all of Plaintiff's claims herein.

4884-3141-4357, v. 1

Atalanta to pay for any product until it was delivered and inspected by Atalanta.

c.   Atalanta's purchase orders to Gourmet included the term "Free on Board New York Ports," meaning that Atalanta was not responsible and did not have any ownership in the product until the product was physically delivered to Atalanta.

d.   None of the Product was ever delivered or tendered for delivery to Atalanta.

e.   None of the Product was ever owned or offered for ownership by Atalanta.

f.   None of the Product was ever in Atalanta's actual or constructive possession, custody, or control.

g.   Gourmet was never Atalanta's express or implied agent in any respect.

h.   Atalanta did not draft, and had no input in the drafting or the content of, any bills of lading identifying Atalanta as the consignee of the product listed therein, and the listing of Atalanta as consignee on the impacted bills of lading does not indicate, prove, or transfer ownership or responsibility for the listed product.

i.   The 14 Invoices provided for a free on board point of "pick up," which indicated the East Coast location where Atalanta would pick up the product.  Pecorino cheese was always delivered to Atalanta on the East Coast, and Atalanta would not accept such product at any other location.

j.   Atalanta never agreed that it would pay for the Product without first receiving physical delivery of it, and it was not the custom or practice of the industry to do so.

k.   Atalanta never agreed that it would pay for the Product if the Product was not conforming to Atalanta's requirements for pecorino cheese.

l.   Plaintiff, as Gourmet's apparent assignee, steps into the shoes of Gourmet and is precluded from enforcing any invoice if Atalanta has legitimate claims or objections to deliveries, which Atalanta would have had here if the Product was never actually and physically delivered.

m.   Mazzella never reconfirmed or represented to Plaintiff that Atalanta would pay for the 14 Invoices, or would pay for the 14 Invoices if the Product was never delivered.

16

n.   Plaintiff fully understood that the 14 Invoices were not legitimate or enforceable against Atalanta.  In fact, Plaintiff and Gourmet, without even notifying or involving Atalanta, withdrew, cancelled, and replaced certain of the 14 Invoices to, among other reasons, permit Gourmet additional time to sell the product to its own customers.

o.   Plaintiff was actively involved with Gourmet in changing invoice numbers and delivery dates on many of the 14 Invoices without notifying or involving Atalanta demonstrating that Plaintiff and Gourmet did not reasonably believe or treat the 14 Invoices as obligations of Atalanta, or legitimate transactions to deliver product to Atalanta.

p.   Plaintiff and Gourmet proceeded to modify the 14 Invoices in order to accommodate Gourmet and to avoid Plaintiff from having to report such invoices as overdue to Plaintiff's credit insurer

q.   The fact that Plaintiff and Gourmet withdrew, cancelled, and replaced certain of the 14 Invoices demonstrates that the 14 Invoices were not legitimate and did not represent any legitimate order of goods from Atalanta.

r.   To the extent the 14 Invoices initially represented legitimate transactions, Atalanta timely canceled, and Gourmet agreed to cancel, any alleged order for the Product.

s.   Atalanta did not have a business need for the Product given its inventory levels.  Atalanta's employee did confirm the issuance of the 14 Invoices even though it did not require the Product.  But, the Product, as noted above, was never delivered to Atalanta, and any order for it also was cancelled with Gourmet's consent.  Plaintiff cannot rely on that initial confirmation as a promise to pay for undelivered goods, and Plaintiff fully understood that the order could be cancelled or nullified if delivery failed or the goods were non-conforming.

t.   During its relationship with Atalanta, Gourmet delivered Atalanta product via maritime shipping vessels.

u.   These shipping vessels originated in Europe.

v.   These shipping vessels took typically approximately 4-6 weeks or more to arrive at the port of destination in the United States.

w.   During its relationship with Atalanta and Plaintiff, Gourmet would draft invoices within a day of when the product was laded on a shipping vessel in Europe.

17

x.      If relying on Plaintiff for financing of an invoice, Gourmet would deliver such an invoice to Plaintiff or an affiliate within a day of when the product was laded on the shipping vessel.

y.      Plaintiff would typically provide a copy of the invoice to Atalanta on or about the same day the invoice was issued.

z.      Atalanta would then respond to Plaintiff concerning Gourmet invoices within about one business day.

aa.     Approximately a few days after Atalanta's response, and before the invoiced product had been shipped overseas and delivered to Atalanta at the agreed upon destination, Plaintiff allegedly advanced funds to Gourmet against the invoice.

bb.     During its relationship with Gourmet, Atalanta was not obligated to pay for – and never paid for – any product unless and until it was physically received by Atalanta at the designated and agreed upon port.

cc.     During its relationship with Gourmet, Atalanta had the right to cancel or return any product delivered to Atalanta at least seven days after such delivery, without financial liability to Gourmet.

dd.     Atalanta was not required to confirm that it would pay for any goods in advance, and payment terms, even on the 14 Invoices, required payment only after delivery.

ee.     The Product was under the exclusive control of Gormet Ltd. or its affiliate Gourmet LLC at all times, and the shipping, bill of lading, customs, trucking, and storage documents demonstrate that Atalanta never received or owned the Production, which was delivered to Gourmet's sole possession, custody, and control in California.

ff.     After the Product was delivered to Gourmet, it sold three containers (representing three of the 14 Invoices) of the Product, and Gourmet paid the invoice proceeds directly to Plaintiff, revealing to Plaintiff that Atalanta was not involved in the transactions at all.

gg.     Nine container loads of the Product (representing nine invoices), which at the time had a market value of $1,775,611.81, were damaged when placed in frozen storage at Gourmet's leased storage facility in California.

hh.     Gourmet then filed a lawsuit in California against the operator of the cold-storage facility for negligently placing these container loads of the Product in frozen storage.  Gourmet did not involve or name

Atalanta in this action and prosecuted the claim based on its ownership of the impacted product.

ii.   Plaintiff thereafter intervened in Gourmet's litigation against the operator of the cold-storage warehouse and, like Gourmet, did not join Atalanta as a party or claim Atalanta had any rights in the lawsuit or the recovery, even though now it claims differently.

jj.   Plaintiff brought a separate action in California against Gourmet to seize and take control of the Product and did not join Atalanta as a party.

kk.   Plaintiff thereafter participated in the negotiations with third-party buyers concerning the sale of the damaged and undamaged Product, and Atalanta was not a part of these negotiations.

ll.   It has been determined that the Product, and earlier deliveries of pecorino cheese to Atalanta, did not conform to Atalanta's and the industry's standards for pecorino cheese.  The term "pecorino" means cheese containing 100 percent sheep's milk, as the presence of any other milk in the cheese alters its taste and lowers its quality.

mm.   Atalanta required Gourmet to supply it with 100 percent sheep's milk pecorino cheese product originating in Bulgaria.

nn.   The presence of any cow's milk in the pecorino cheese product it offered or delivered to Atalanta, or a product originating outside of the Bulgaria, would constitute a breach of Atalanta's requirements for such product.

oo.   The Product contained a quantity of cow's milk, and thus was non-conforming.  If the Product were delivered to Atalanta, Atalanta would have been able to reject the goods without any financial penalty or liability.

pp.   Atalanta would not have accepted pecorino cheese product with any amount of cow's milk in it.

qq.   Atalanta would not have accepted pecorino cheese product for delivery on the West Coast.

rr.   Additionally, photos of the adulterated Product revealed that it bore Gourmet's packaging and a trademarked insignia owned by Gourmet, further indicating that the Product was never intended to be delivered to Atalanta.

ss.   Additionally, the Product was not manufactured in an acceptable country as per Atalanta's standards and earlier purchase orders.

19

Atalanta did not learn that the Product or the pecorino cheese product it ordered from Gormet Ltd. or Gourmet LLC in 2014 was produced in Macedonia until after this action began.

tt.     Atalanta would not have accepted what was supposed to be Bulgarian manufactured pecorino cheese product from Gormet Ltd. or Gourmet LLC that was manufactured in Macedonia.

ii.     With respect to the claims that Atalanta made direct payments to Gourmet (or Gormet) and withheld payments due to Gourmet (or Gormet) (Counts Six and Seven):

a.      In or about August of 2013, Atalanta received an unsigned notice and related emails from Gourmet that informed Atalanta that only those invoices that Gourmet presented for financing and about which Factoring contacted Atalanta for verification been had been assigned to and were payable to Special as 100% owner and sole payee.

b.      The notice advised Atalanta to pay Special on the invoices Gourmet financed or assigned subject to further instructions.

c.      After receiving the notice and related emails from Gourmet, Atalanta began receiving Gourmet invoices from Factoring that bore a legend that indicated that the "underlying account receivable of the invoice has been assigned to [Plaintiff] and [Special]. Your liability remains in force until settlement of the full invoice amount is received into the account of … Special."

d.      Atalanta paid Special in accordance with the instructions on Gourmet invoices that bore the legend and for which Special or Factoring presented to Atalanta for verification.

e.      When Factoring would send a Gourmet invoice to Atalanta seeking confirmation or verification of the invoice, Atalanta would review the invoice to determine whether the invoice listed the correct quantity and pricing.

f.      When Atalanta responded to Factoring's inquiries about Gourmet invoices, it never represented, and did not intend to represent, that Atalanta had physically received the goods or that Atalanta would pay for the goods without first physically receiving them, without receiving conforming goods, or without any other offset.

g.      Atalanta would not approve payment on any Gourmet invoice until Atalanta had physically received the goods at the agreed location.

20

h.    In 2015, Plaintiff knowingly and intentionally abandoned and withdrew the notice.

i.    In March of 2015, Plaintiff's management told Gourmet to inform its customers that they should disregard, and no longer follow, the Notice.

j.    Plaintiff or its affiliates told Gourmet to alert its vendors, including Atalanta, that, going forward, payment should be made per each subsequent invoice.

k.    Plaintiff's general counsel, corporate officer, and corporate designee confirmed under oath the withdrawal of the notice, and that Plaintiff chose not to issue a new notice for the new company that was entitled to receive payment on financed invoices.

l.    In or about March 2015, Gourmet began issuing invoices that would contain one of two legends. For invoices that Gourmet financed, it provided Atalanta a new payment legend advising that the "underlying account receivable of the invoice has been assigned to [Plaintiff] and DS-Concept ITF LLC. Your liability remains in force until settlement of the full invoice amount is received into the account of DS-Concept ITF LLC." For invoices that Gourmet did not finance, it requested Atalanta pay Gourmet directly. There was not a single invoice that Gourmet directed payment to it that it financed, and vice versa.

m.    Atalanta paid each invoice directing payment to ITF, and neither the Plaintiff, Special, nor Factoring ever objected to such payments.

n.    Plaintiff ceased financing or accepting Atalanta's invoices for financing as of September 2015.

o.    Plaintiff and Gourmet's factoring relationship was terminated in September 2015.

p.    Atalanta has no liability to Gourmet on the "2016 Invoices" identified in Plaintiff's Amended Complaint.

q.    The Paid Invoices included a legend indicating payment should be made to Gourmet.

r.    The 2016 Invoices included a legend indicating payment should be made to Gourmet.

iii.    With respect to Plaintiff's complaints concerning the $541,200 in trade financing Atalanta extended to Gourmet (Count Six)

21

a.   Atalanta claims no payment responsibilities to Plaintiff as Atalanta was not restricted from extending credit to Gourmet, Gourmet readily disclosed the credit extension to Plaintiff, and Plaintiff continued to do business with Gourmet with full knowledge of the credit extended.

b.   In 2014, Atalanta provided Gourmet with a zero-interest loan in the amount of $541,200.00 (the "Trade Financing"), with the loan proceeds to be used by Gourmet to pay its milk supplier to begin production of an order from Atalanta to Gourmet of 20 containers of Bulgarian pecorino cheese product.

c.   If a particular purchase did not fit the general needs of Atalanta's business, Mazzella was required to obtain pre-approval from Atalanta management before making the purchase.

d.   This amount of pecorino cheese product was in excess of Atalanta's usual business needs.

e.   Mazzella was therefore required to obtain authorization from his superiors at Atalanta before he placed the order for 20 containers of Bulgarian pecorino cheese product, or any additional containers of such product.

f.   Mazzella's superiors authorized only the initial 20 container order of Bulgarian pecorino cheese product from Gourmet, and no further orders of such product.

g.   By 2015, because of an excess inventory, Mazzella knew or should have known that Atalanta did not need or have any legitimate use for any Bulgarian pecorino cheese product beyond the 20-container order Atalanta placed with Gourmet in 2014.

h.   Atalanta was not restricted from providing the Trade Financing to Gourmet.

i.   Gourmet was not restricted from obtaining the Trade Financing from Atalanta, and Plaintiff did not claim any such restriction for well over one year and until after this action was started.

j.   Atalanta and Gourmet agreed that Gourmet would repay the Trade Financing through credits Gourmet would provide to Atalanta on invoices for the finished cheese product that Gourmet would issue after the cheese product was finished and shipped to Atalanta.

k.   To evidence the Trade Financing, Gourmet issued to Atalanta a "pro forma" invoice for $541,200.00.

l.   Even if presented to Plaintiff for advance funding or factoring, Plaintiff would not have accepted the "pro forma" invoice.

m.   Plaintiff and its leadership learned of the Trade Financing in the summer of 2014, before any of the ordered product shipped, and before it decided to finance the impacted invoices less the amount of the assigned percentage of the Trade Financing.

n.   After learning of the Trade Financing, Plaintiff and its leadership agreed to Gourmet's plan to repay Atalanta the full amount of the Trade Financing through credits Gourmet extended to Atalanta on Gourmet's invoices for shipments of the cheese product in Atalanta's order.

o.   Plaintiff thereafter received all twenty invoices Gourmet issued to Atalanta for the 20-container order related to the Trade Financing, which included line items for "credit returns" that reduced the invoices' net amount.

p.   Plaintiff received each invoice indicating "credit returns" for the Trade Financing before it provided financing to Gourmet on such invoices.

q.   Plaintiff acquiesced to Gourmet's receipt of the Trade Financing and waived any claim it now brings against Atalanta to recover the amount of the Trade Financing.

B.   Atalanta intends to prove the following contested facts with regard to damages:

i.   With respect to the 14 Invoices (Counts One Through Five):

a.   All of the Product was sold to customers of Gourmet and the proceeds of those sales were kept by Gourmet or delivered to Plaintiff.

b.   The face amount of the 14 Invoices was $2,631,799.03, and Plaintiff has already recovered a total of $1,818,860.51, representing approximately 70% of the 14 Invoice total.

1.   The first three of the 14 Invoices, which have a face value of $568,610.80, were sold by, and paid in full by, Gourmet, and Plaintiff accepted such payment, booked it against the value of such invoices, and marked such invoices as paid in full.

2.   As to the remaining 11 of the 14 Invoices:

23

a.  At the time certain of the Product was placed in frozen storage and damaged, the market value of the product was $1,775,611.81.

b.  Plaintiff recovered $563,000.00 in a negligence suit against the cold-storage company that placed a portion of the Product in frozen storage.

c.  Plaintiff recovered an additional $687,249.71 from the sale of the damaged and undamaged Product.

3.  In total, Plaintiff recovered $1,250,249.71 related to the sale of the damaged and undamaged Product.

c.  Plaintiff has since released Gourmet and Jikovski of all financial liability for the claims asserted against Gourmet in this action and pursuant to Jikovski's personal guarantee of all amounts due and owing from Gourmet to Plaintiff.  Plaintiff is not seeking further recovery from Gourmet or Jikovski in this or any other action.

d.  Atalanta secured a judgment in this action, the Gourmet Judgment, which remains unpaid.

e.  Atalanta can recoup the Gourmet Judgment against any amounts claimed by Plaintiff or as a result of Plaintiff exercising its rights.

ii.  With respect to the Trade Financing (Count Six):

a.  Plaintiff advanced no funds to Gourmet against the "pro forma" invoice evidencing the Trade Financing.

b.  Plaintiff provided Gourmet advances on the invoices through which Gourmet repaid Atalanta the Trade Financing in the net amount, less the credit for repayment of the Trade Financing.

c.  Plaintiff suffered no damages by virtue of the Trade Financing.

iii.  With respect to the alleged Direct and Withheld Payments (Counts Six and Seven):

a.  Gourmet did not present any of the Paid Invoices to Plaintiff for financing.

b.  Plaintiff advanced no funds to Gourmet on any of the Paid invoices.

c.  Gourmet did not present any of the impacted invoices to Plaintiff for financing.

      d.      Plaintiff advanced no funds to Gourmet on any of the impacted invoices.

      e.      Plaintiff suffered no damages.

**8.**    **DS-Concept's Causes of Action and Affirmative Defenses**

A.    DS-Concept makes the following cause of action:

(1) Count 1 - Breach of Contract for 11 Unpaid Invoices; (2) Count 2 – Quantum Meruit; (3) Count 3 – Book Account; (4) Count 4 – Promissory Estoppel; (5) Count 5 – Equitable Estoppel; (6) Count 6 – Breach of Contract/UCC 9-406(a) for 11 Direct Payment Invoices; (7) Count 7 – Breach of Contract/UCC 9-406(a) for 2016 Invoices.

B.    To the extent there is a cross-claim, counterclaim or other claim for affirmative relief against DS-Concept, DS-Concept raises the following affirmative defenses:

None.

**9.**    **Atalanta's Claims and Affirmative Defenses**

A.    Atalanta raises the following affirmative defenses to Plaintiff's claims:

    i.    Gourmet never delivered the Product or offered the Product for delivery to Atalanta.

    ii.    Atalanta never received, took or was offered delivery, or had possession, custody or control of the Product.

    iii.    Atalanta did not agree or otherwise represent to Plaintiff that it would pay for the Product – or any other product sold to it by Gourmet during the parties' relationship and course of dealing – without offset, counterclaim, or first being offered for delivery and accepting the Product.

    iv.    Atalanta did not agree or otherwise represent to Plaintiff that it would pay for the Product – or any other product sold to it by Gourmet during the parties' relationship and course of dealing – even if the Product were not conforming to Atalanta's requirements for the Product or any other product sold by Gourmet.

    v.    Atalanta did not agree or otherwise represent to Plaintiff that it would pay for the Product – or any other product sold to it by Gourmet during the parties' relationship and course of dealing – even if the Product were not conforming to Atalanta's requirements that the Product or any other product sold by Gourmet originate in the European Union.

    vi.    Plaintiff did not reasonably rely on any representation of Atalanta with respect to the 14 Invoices.

25

vii.    The Product did not conform to the parties' contractual requirements, the parties' course of dealing, and accepted industry practice and standards.

viii.   Gourmet materially breached any alleged agreement with Atalanta with respect to the Product.

ix.     Gourmet cancelled or agreed to cancel the order allegedly supporting the 14 Invoices.

x.      Atalanta did not order or agree to order the Product.

xi.     The 14 Invoices were not representative of a bona fide order from Atalanta to Gourmet and were fraudulent.

xii.    Gourmet and Plaintiff cancelled and/or replaced the 14 Invoices.

xiii.   To the extent Atalanta is found to have ordered, accepted, and/or wrongfully rejected the Product, it is entitled to a credit against Plaintiff's claimed damages in the amount of (a) the fair market value of the portion of Product at the time it was placed in frozen storage and damage; and (b) the total amount Plaintiff recovered from Gourmet and other parties against the face value of the 14 Invoices.

xiv.    Gourmet and Plaintiff converted the Product by retaining it, damaging it, and selling it for their own benefit.

xv.     Plaintiff received full or partial payment on the 14 Invoices.

xvi.    Plaintiff's claims for amounts due are subject to Atalanta's rights to set off and/or recoup amounts due and owing from Gourmet to Atalanta on the Gourmet Judgment.

xvii.   Plaintiff's claims are barred by the applicable Statute of Frauds.

xviii.  Atalanta never received any right, title, or interest in the Product.

xix.    Plaintiff waived, disregarded, and abandoned the Notice and any right Plaintiff claims to enforce the Notice in this action with respect to the Paid Invoices, the Trade Financing, and the 2016 Invoices.

xx.     Gourmet did not have the obligation to present all of its invoices to Plaintiff for factoring.

xxi.    Plaintiff suffered no damage by virtue of any of Atalanta's payments to Gourmet on Gourmet invoices.

26

xxii.     Plaintiff acquiesced to the Trade Financing, waived any claim against Atalanta therefor, and, in any case, suffered no damages by virtue of the Trade Financing.

xxiii.     Plaintiff failed to reasonably police its collateral and failed to act in good faith in all respects.

xxiv.     DS and Gourmet withdrew, canceled, and replaced certain of the 14 Invoices without Atalanta's knowledge or involvement.

B.     To the extent Atalanta has a cross-claim, counterclaim or other claim for affirmative relief, those claims are as follows:

i.     Declaratory Judgment.  Atalanta seeks a declaration that (a) it is not liable to Plaintiff for payment of the 14 Invoices; (b) it is not liable to Plaintiff for payment of the Trade Financing; (c) it is not liable to the Plaintiff for the amount of any of the Paid Invoices; (d) it is not liable to Plaintiff for the amount of any of the 2016 Invoices; (e) that DS abandoned and/or waived the Notice; and (f) that it is entitled to offset and/or recoup any amounts allegedly owed to Gourmet against the amount Gourmet owes Atalanta on the Gourmet Judgment.  *See* D.E. 118, ¶¶ 276-283.

ii.     Conversion.  Atalanta alleges that, to the extent it is found to have ordered, accepted, taken delivery of, and/or taken an ownership interest in any of the Product, Plaintiff and Gourmet are liable to Atalanta for converting such Product, selling it to third-parties, and keeping the proceeds of such sales for their own benefit.  *See* D.E. 118, ¶¶ 291-96.

**10.    DS-Concept's Witnesses**

A.     On liability, DS-Concept intends to call the following witnesses:

John Bettex ("Bettex")
c/o Lawrence C. Weiner, Esq.
Mandelbaum Barrett PC
3 Becker Farm Road
Roseland, NJ 07068

Bettex will testify as to the factoring industry in general, DS-Concept's business, DS-Concept's relationship with Gourmet, DS-Concept's relationship with Atalanta, Bettex's communications and interactions with Mazzella and others, the verification process and in conformity with his deposition testimony.

27

> Boris Tzvetanov ("Tzvetanov")
> c/o Lawrence C. Weiner, Esq.
> Mandelbaum Barrett PC
> 3 Becker Farm Road
> Roseland, NJ 07068

Tzvetanov will testify as to the factoring industry in general, DS-Concept's business, DS-Concept's relationship with Gourmet, DS-Concept's relationship with Atalanta, Tzvetanov's communications and interactions with Mazzella and others, the verification process and in conformity with his deposition testimony.

> Ansgar Hüetten ("Hüetten")
> c/o Lawrence C. Weiner, Esq.
> Mandelbaum Barrett PC
> 3 Becker Farm Road
> Roseland, NJ 07068

Hüetten will testify as to the factoring industry in general, DS-Concept's business, DS-Concept's relationship with Gourmet, DS-Concept's relationship with Atalanta, DS-Concept's repurchase and reassignment of the 14 Invoices, the verification process and in conformity with his deposition testimony.

> Mary Smith ("Smith")
> c/o Lawrence C. Weiner, Esq.
> Mandelbaum Barrett PC
> 3 Becker Farm Road
> Roseland, NJ 07068

Smith will testify about the verification process with Atalanta concerning Gourmet's invoices.

> Denisse Mieles ("Mieles")
> c/o Donald E. Taylor, Esq.
> Wilentz Goldman & Spitzer P.A.
> 90 Woodbridge Center Dr.
> Woodbridge, NJ 07095

28

Mieles will testify about the verification process with Atalanta concerning Gourmet's invoices.

> Sewar Nassar
> c/o Donald E. Taylor, Esq.
> Wilentz Goldman & Spitzer P.A.
> 90 Woodbridge Center Dr.
> Woodbridge, NJ 07095

Nassar will testify about the verification process with Atalanta concerning Gourmet's invoices.

> Mark Mazzella
> 20 Farm Road
> Chester Township, NJ 0930

Mazzella will testify concerning his job title and duties when he was employed with Atalanta, his management and responsibility for the Gourmet account, his authority and discretion to order cheese in general and the cheese that is the subject matter of this lawsuit, approval of payments of Gourmet invoices that are the subject matter of this litigation, communications with Bettex concerning Atalanta's receipt of the cheese and that Atalanta did not reject the cheese represented in the 14 Invoices, Atalanta's agreement to a payment plan for the 14 Invoices and the December 23, 2015 Bill of Sale of the cheese represented in the 14 Invoices, with Mazzella, senior product manager of Atalanta in charge of the Gourmet account, transferring ownership of such cheese to Gourmet.

> Thomas Gellert
> c/o Zachary Newman, Esq.
> Thompson Coburn Hahn & Hessen, LLP
> 488 Madison Avenue
> New York, NY 10022

Gellert's testimony will be in conformity with his deposition testimony and such other areas as shall evolve during examination.

4884-3141-4357, v. 1

John Rodger
c/o Zachary Newman, Esq.
Thompson Coburn Hahn & Hessen, LLP
488 Madison Avenue
New York, NY 10022

Rodger's testimony will be in conformity with his deposition testimony and such other

areas as shall evolve during examination.

Tom DeCarlo
c/o Zachary Newman, Esq.
Thompson Coburn Hahn & Hessen, LLP
488 Madison Avenue
New York, NY 10022

DeCarlo's testimony will be in conformity with his deposition testimony and such other

areas as shall evolve during examination.

Sadina Atchison
c/o Jennifer Mara, Esq.
Baldassare & Mara, LLC
570 Broad Street
Suite 900
Newark, NJ 07102

Atchison's testimony will be in conformity with her deposition and such other areas as

shall evolve during examination.

Steve Sorahan
c/o Zachary Newman, Esq.
Thompson Coburn Hahn & Hessen, LLP
488 Madison Avenue
New York, NY 10022

Sorahan's testimony will be in conformity with his deposition and such other areas as shall

evolve during examination.

Ruby Collantes
c/o Zachary Newman, Esq.
Thompson Coburn Hahn & Hessen, LLP
488 Madison Avenue
New York, NY 10022

Collantes' testimony will be in conformity with her deposition and such other areas as shall evolve during examination.

> Tracey Archbold ("Archbold")
> c/o Stephen Dratch, Esq.
> Franzblau, Dratch, PC
> 354 Eisenhower Parkway
> Livingston, NY 07039

Archbold will testify concerning Atalanta's insurance claim relating to Mazzella's handling of the Gourmet account and such other areas as shall evolve during examination.

> Zachary Newman, Esq. ("Newman")
> Thompson Coburn Hahn & Hessen, LLP
> 488 Madison Avenue
> New York, NY 10022

Newman will testify concerning Atalanta's insurance claim relating to Mazzella's handling of the Gourmet account and such other areas as shall evolve during examination.

> Guy (Guido) Perego
> Stella International, Inc.
> 167 Mesa Verde Way
> San Carlos, CA 94079

Guy (Guido) Perego will be in conformity with her deposition and such other areas as shall evolve during examination, particularly concerning the arrival and customs brokerage of the shipments of Pecorino cheese at issue.

DS-Concept also reserves its right to read in deposition testimony of witnesses Mieles, Nassar, Rodger, Atchison, Mazzella, and Perego should any of them become unavailable within the meaning of Fed. R. Civ. P. 32(a)(4).

B.     On damages, DS-Concept intends to call the following witnesses:

> Bettex

Bettex will testify to all the components of DS-Concept's damages claim.

In addition to the witnesses listed above, DS-Concept reserves the right to call as live witnesses at trial as to liability and damages those witnesses identified on DS-Concept's list of deponents in paragraph 13.

    C.    Atalanta objects to the following witnesses for the reasons stated:

        i.    **John Bettex**.  Plaintiff lists Mr. Bettex, an attorney, as its sole damages witness.  To the extent that Plaintiff has withheld any discovery materials from Atalanta that are germane to Mr. Bettex's testimony on Plaintiff's alleged damages on the grounds privilege, Atalanta submits that Mr. Bettex's testimony as to such matters would create an at-issue waiver of such privilege.  On that basis, Atalanta would object to Mr. Bettex's trial testimony as to damages without disclosure of any such materials and an opportunity for a further pre-trial examination of him.

       ii.    **Mark Mazzella**.  Atalanta objects to the use of Mazzella's deposition testimony at trial for the reasons to be stated in its contemplated motion *in limine* and further objects to Mazzella being called as a trial witness for the reasons stated below.

As an initial matter, Atalanta objects to Plaintiff's purported summary of Mazzella's trial testimony as unsupported by any previous statement or testimony of Mazzella.  At his deposition, Mazzella asserted his Fifth Amendment right against self-incrimination with respect to every substantive and factually relevant question posed to him by both Plaintiff's and Defendant's counsel.  The parties therefore never obtained any substantive testimony from Mazzella and cannot therefore reasonably predict what substantive answers Mazzella will give at trial.  For the same reason, if Mazzella appears at trial and gives substantive answers, his testimony presents a clear risk of undue surprise and undue prejudice under F.R.E. 403 and would violate Fed. R. Civ. P. 30 and 45 insofar as they allow for a party to take substantive testimony of a witness prior to trial.

Despite the possibility that Mazzella testifies substantively, both parties believe (*see* ¶ 19 herein), that Mazzella, if called for trial, will continue to invoke his rights against self-incrimination in response to each question posed to him by counsel concerning his conduct with respect to Plaintiff and Gourmet.  If he does so, Atalanta submits that his testimony will carry no evidentiary value or relevance and will therefore be inadmissible under F.R.E. 401 and 402.  Additionally, such non-substantive testimony would also clearly present the risk of undue prejudice to Atalanta, confusion of the issues, or confusion or misleading of the jury and inadmissible under F.R.E. 403.

iii.    **Traian "Tim" Jikovski**.  Atalanta objects to DS' reading of Jikovski's deposition testimony for the reasons stated in Atalanta's contemplated motion *in limine* to preclude the use of such testimony at trial.  Specifically, Atalanta objects to the use of Jikovski's deposition testimony at trial on the grounds that, when DS' counsel finished examining Jikovski during his deposition on April 4, 2017, Jikovski and his counsel refused to allow Atalanta to cross-examine Jikovski, in violation of Fed. R. Civ. P. 30(c)(1), leading to an Order from the Court directing Jikovski to appear for his continued deposition and to answer the amended pleadings in this matter, both of which Jikovski failed to do.  *See* D.E. 152, pp. 13:15-14-19:3.

iv.    **Tracey Archbold**.  Atalanta objects to Ms. Archbold being called as a witness at trial for the following reasons.

First, Ms. Archbold is an adjuster at Atalanta's crime/fraud insurance carrier, Great American Insurance Group ("GAIG").  Plaintiff never sought to take her deposition.  Her involvement in the matter was limited to communicating with Atalanta's counsel with respect to an insurance claim Atalanta filed with GAIG related to certain conduct of Mazzella.  Ms. Archbold was not involved in any of the events underlying the claim, which was denied.  Ms. Archbold therefore has no personal knowledge of any relevant facts, rendering her testimony as to such matters inadmissible under F.R.E. 602.

Second, Atalanta has provided Plaintiff with all non-privileged documents Atalanta shared with GAIG in connection with its insurance claim.  Such documents consist of materials were previously exchanged in discovery and that, in any case, were not generated by GAIG.  Ms. Archbold therefore does not have the requisite personal knowledge to authenticate any such documents.  *See* F.R.E. 602.

Third, the Court has already ruled that Atalanta's communications with GAIG concerning its insurance claim, except for the proof of claim itself and the documents Atalanta submitted in support of it, are privileged and otherwise not subject to disclosure.  *See* D.E. 157.  Plaintiff did not appeal this ruling and cannot now examine Ms. Archbold about such privileged communications.

Fourth, at best, Ms. Archbold would have the personal knowledge to testify that Atalanta made a claim with GAIG under its policy, that GAIG reviewed Atalanta's submissions in support of the claim, and that the claim was denied on the basis that Atalanta's policy did not provide coverage for the specific conduct described.  None of these facts are relevant to the issues in this matter – *i.e.*, whether Atlanta is liable to Plaintiff for the invoices and payments alleged in Plaintiff's Amended Complaint – and are thus inadmissible.  *See* F.R.E. 401, 402.

Finally, the fact of Atalanta's claim and its denial are also inadmissible under F.R.E. 403, as whatever evidentiary value such facts may have is clearly outweighed by the risk of undue prejudice to Atalanta and confusion of the issues. The law – not the terms of Atalanta's insurance policy – controls this matter, and Plaintiff has made no claim that it is entitled to recovery of whatever Atalanta obtains from GAIG on its insurance claim.

v. **Zachary Newman**. Plaintiff has designated Mr. Newman to testify concerning the same topic about which it has designated Ms. Archbold to testify. Atalanta objects to Mr. Newman being called at trial for the same reasons set forth in its objection to Ms. Archbold's designation and for the additional reasons stated below.

First, Plaintiff never indicated Mr. Newman was a witness, and Plaintiff's counsel never sought to depose or to take any discovery for Mr. Newman during discovery. At no time prior to the drafting of this Order did Plaintiff ever indicate that it intended to call Mr. Newman, Atalanta's lead trial counsel, as a witness at trial, and Atalanta respectfully submits that Plaintiff is doing so to disrupt the trial, or the engage in litigation gamesmanship.

Second, given that Mr. Newman has represented Atalanta in this matter since it began in 2016, his testimony concerning any relevant matter will therefore implicate attorney/client communications, attorney work product, or other privileged matters not subject to disclosure. Atalanta and Mr. Newman have not waived – and will not waive – any such privilege. Mr. Newman's testimony is therefore inadmissible under F.R.E. 501, 502, Fed. R. Civ. P. 26(b), and the common law.

Third, as noted above, the Court has already ruled that Atalanta's communications with GAIG concerning its insurance claim, except for the proof of claim itself and the documents Atalanta submitted in support of it, are privileged and otherwise not subject to disclosure. *See* D.E. 157. Plaintiff did not appeal this ruling and cannot now examine Mr. Newman about such privileged communications.

Finally, to the extent Mr. Newman has knowledge of any non-privileged matters, such testimony will be purely cumulative of other evidence to be submitted at trial. *See* F.R.E. 403.

**11. Atalanta's Witnesses**

A. On liability, Atalanta intends to call the following witnesses who will testify in accordance with the following summaries:

i.     **Thomas Gellert**

Mr. Gellert is the President of Atalanta.  He will testify that, around April 2014, Mark Mazzella, an Atalanta product manager, sought permission from Mr. Gellert, John Rodger – the head of Atalanta's Cheese and Specialty Deli Department – and Tom DeCarlo – Atalanta's CFO – to purchase a quantity of Bulgarian pecorino cheese product from Gourmet, which at the time supplied Atalanta with feta cheese and other products.  At the time, the cost of Italian pecorino cheese had been rising, leading to a demand for a lower-cost alternative such as the Bulgarian product that Gourmet offered.  Atalanta ultimately agreed to purchase approximately 20 shipping containers' worth of Bulgarian pecorino cheese from Gourmet for delivery to Atalanta on the East Coast.  At the time, Gourmet asked Atalanta to provide it with pre-order financing of $541,000 so that Gourmet would have the capital to purchase the milk for the order.  Gourmet agreed, in return, to repay Atalanta's financing by providing Atalanta credits against the invoices for the finished goods until the balance reached zero.  Mr. Gellert, Mr. Rodger, and Mr. DeCarlo agreed to this financing structure.

Atalanta provided Gourmet with the financing payment, which Gourmet repaid as planned through invoice credits.  Atalanta received all of the product from the 20-container order from approximately October 2014 through June 2015.  Atalanta paid the full invoice amounts for this product, less the credits for the financing payment, to Plaintiff as Gourmet's factor.  After the 20-container order was completed, Atalanta had no legitimate business need for additional Bulgarian pecorino cheese product from Gourmet – and, in fact, had a significant surplus of Bulgarian pecorino cheese in its warehouse in New Jersey.  This was partly due to the fact that the price of Italian pecorino cheese began to normalize, reducing the market price for the Bulgarian substitute product.  At the time, Mr. Gellert repeatedly implored Mazzella, who was responsible for the inventory Atalanta received from Gourmet, to sell the surplus pecorino cheese product.  Mazzella

35

knew he did not have authority to order, confirm orders for, or accept additional Bulgarian pecorino cheese product from Gourmet, as such authority to order product was limited by Atalanta's legitimate business needs.

In the summer of 2015, Mazzella again sought permission from Mr. Gellert to enter a potential business opportunity with Gourmet.  Gourmet proposed to sell and then purchase back from Atalanta a large quantity of myzithra cheese.  Mr. Gellert rejected the proposal.

Mazzella resigned from Atalanta in December 2015.  Atalanta learned that Mazzella had begun working for Gourmet.  In January of 2016, Atalanta first learned that Plaintiff had claimed Atalanta ordered and failed to pay for 11 additional containers of Bulgarian pecorino cheese that Gourmet had provided to it.  Atalanta had no record of ever ordering or receiving this product – and, in fact, did not order or receive it.  Atalanta also discovered that the pecorino cheese product Gourmet had provided to it did not conform to Atalanta's requirements for pecorino cheese and was not, in reality, sourced from Bulgaria as Gourmet had claimed.  Instead, the product Gourmet had been importing originated in Macedonia.  Atalanta also learned that the product listed in the invoices for which Plaintiff seeks payment was cleared through customs by Gourmet's customs agent in Oakland, California – a port where Atalanta never would have received or accepted this type of cheese – bore Gourmet's own trademark, was delivered to Gourmet at its own warehouses or public warehouses Gourmet leased, and was sold to Gourmet's customers, with the proceeds being kept by Gourmet or paid over to Plaintiff.  Atalanta then learned that, after Mazzella knew of the excess inventory of pecorino cheese product in Atalanta's inventory, Gourmet issued to Atalanta approximately six additional invoices for container loads of the product for which Atalanta had no purchase order.  To support these alleged orders, Mazzella created retroactive purchase orders for and caused Atalanta to pay for the product, which it did not need.  Additional

36

investigation revealed that, at the time, Mazzella had been receiving cash payments, both directly and indirectly, from Gourmet – more than $60,000 in total.

Plaintiff filed this litigation in January of 2016.  Around the time the litigation began, Gourmet issued a number of invoices to Atalanta for feta and other types of cheese.  Given the litigation and potential claims against Gourmet, Atalanta did not make payment on these invoices after receiving the product listed therein.

   ii.  **John Rodger**

Mr. Rodger is the former head of Atalanta's Cheese and Specialty Deli Department.  Mr. Rodger will testify that, during his time at Atalanta, the authority of product managers and buyers to purchase products for Atalanta was limited by the legitimate needs of the business.  Those needs were informed by several factors, including whether a product had a regular market and the shelf life of the particular product.

In 2014, Mark Mazzella, a product manager, sought permission from Mr. Rodger, Mr. Gellert, and Mr. DeCarlo to purchase a relatively large quantity of Bulgarian pecorino cheese product from Gourmet.  Mazzella sought his superiors' permission because the amount of product was in excess of his normal buying authority and  because Atalanta did not have a regular customer or market for the product itself.  However, at the time, Atalanta felt one of its affiliates could use a portion of the Bulgarian pecorino and that it could sell the rest to customers looking for a lower-cost alternative to Italian pecorino cheese, which had recently risen significantly in price.  Mazzella also sought permission, in response to Gourmet's request, to provide Gourmet with a payment in the amount of $541,200 against the value of the order so that Gourmet would have the capital to buy the milk needed for the order.  Atalanta agreed to both requests and issued a purchase order from Gourmet for 20 containers of Bulgarian pecorino cheese to be delivered to Atalanta on the East Coast, where Atalanta intended to sell a portion of the product to Tipico Products, an

affiliate.  During the next year, Gourmet fulfilled the 20-container order for Bulgarian pecorino cheese.

During the course of its relationship with Gourmet, Atalanta developed a course of dealing under which Atalanta (a) did not pay for any product it did not actually receive in the United States at its designated warehouse, (b) did not pay for damaged or defective product, (c) had the right to cancel any order without liability to Gourmet before delivery of the product, and (d) agreed and regularly paid Gourmet invoices 30 days after delivery and acceptance of the product.

By the spring of 2015, Atalanta was beginning to hold a large amount of excess inventory of Bulgarian pecorino at its warehouse in Elizabeth, New Jersey.  At the time, the cost of Italian pecorino cheese had fallen, putting pressure on the demand and price for Bulgarian pecorino cheese.  Mr. Rodger and other members of Atalanta's leadership repeatedly flagged the issue for Mazzella and other product managers, who were well informed of the fact that Atalanta needed no additional Bulgarian pecorino cheese.

Mazzella left Atalanta in December of 2015.  After Mazzella's departure, his emails were forwarded to Mr. Rodger.  In January 2016,  Mr. Rodger received a forwarded email that John Bettex, an attorney representing Plaintiff, had sent to Mazzella.  Atalanta then learned, for the first time, that Plaintiff had been claiming that Atalanta had failed to pay it on 11 invoices for Bulgarian pecorino cheese product that Gourmet had presented to Plaintiff for financing and that Mazzella had allegedly confirmed.  Mr. Rodger and another Atalanta employee, Ileana Medina, then searched Atalanta's records and found that they showed Atalanta was current on all Gourmet invoices and that Atalanta had not received any product from Gourmet for which it had not paid. Mr. Rodger and Ms. Medina then joined a call with Mr. Bettex to inform him of this.

38

### iii.      **Tom DeCarlo**

Mr. DeCarlo has been the CFO of Atalanta in 2013.  Mr. DeCarlo will testify that, at the times relevant to this action, Atalanta maintained a procedure for payment of supplier invoices under which actual receipt of the goods by Atalanta, as confirmed by Atalanta's traffic department, was a prerequisite for Atalanta's payment of invoices issued to it and accounts payable generated from those invoices.

In 2014, Mark Mazzella asked Mr. Gellert, Mr. Rodger, and Mr. DeCarlo to approve a potential large purchase of Bulgarian pecorino cheese from Gourmet, as well as a financing payment to Gourmet equivalent to approximately three shipping containers' worth of the product, or $541,200.  Atalanta ultimately agreed to the proposal.

In the summer of 2015, Mazzella emailed Mr. DeCarlo to ask that a copy of Atalanta's financial statements be sent to Euler Hermes, a credit insurer.  Mazzella did not inform Mr. DeCarlo specifically why Euler Hermes needed the documents.  At the time, Mr. DeCarlo had submitted Atalanta's financial statements to Euler Hermes annually under a non-disclosure agreement, as Euler Hermes regularly provided insurance to Atalanta's suppliers and clients and would thus ask for disclosure from Atalanta as part of its underwriting process.  By the time Mazzella emailed Mr. DeCarlo in 2015, however, the documents had already been provided to Euler Hermes pursuant to this practice.

### B.      On damages, Atalanta intends to call the following witnesses who will testify in accordance with the following summaries:

### i.      **Marlene Hampton**

Ms. Hampton is the Risk Manager at Atalanta.  Ms. Hampton will testify that, from April 2014 through March of 2015, Gourmet issued to Atalanta Invoice Nos. 59008, 36, 42, 55, 59, 65, 70-71, 74, 78-80, 84-85, 87-89, and 91-93.  These invoices identified pecorino cheese product,

which was delivered to Atalanta.   In total, Atalanta paid Plaintiff, as Gourmet's factor, $4,255,864.47 for this product.  Atalanta subsequently determined that the product did not conform to Atalanta's requirements for pecorino cheese.

In 2015, Gourmet delivered additional shipments of pecorino cheese product to Atalanta that Atalanta did not legitimately order and that also did not conform to Atalanta's requirements for pecorino cheese.  This product was identified in Gourmet Invoice Nos. 59094-95, 59098-99, and 59101-02.  Atalanta paid Plaintiff, as Gourmet's factor, $1,186,684.15 for this product.

In total, Atalanta paid Plaintiff, as Gourmet's factor, $5,442,584.62 for the identified product, which it was able to sell to third-parties for a total of $4,038,045.92.  This resulted in a net loss to Atalanta of $1,404.502.70.  Gourmet has not paid Atalanta any amounts to offset this loss.

> ii.      **Tom Gellert**

Mr. Gellert will testify in accordance with the summary set forth above and in accordance with his deposition testimony and such other matters as may develop at trial.

> iii.     **Tom DeCarlo**

Mr. DeCarlo will testify in accordance  with the summary set forth above and in accordance with his deposition testimony and such other matters as may develop at trial.

In addition to the witnesses listed above, Atalanta reserves the right to call as live witnesses at trial as to liability and damages those witnesses identified on Atalanta's list of deponents in paragraph 14 herein.

> C.     DS-Concept objects to the following witnesses for the reasons stated:

> i.     **Thomas Gellert.**  DS-Concept objects to Thomas Gellert being called as a witness to testify as to whether Atalanta ordered or received the Pecorino cheese represented by the 14 Invoices, whether the Pecorino was conforming or non-conforming to purported Pecorino cheese requirements or sourcing, the cheese clearance of Customs, the cheese warehousing, sale of the Pecorino cheese, or other

40

matters related to the pecorino cheese represented by the 14 Invoices, alleged payments by Gourmet to Mazzella, and on any matter related to damages. Gellert does not have personal knowledge of these matters and his testimony is therefore precluded under Fed. R. Evid. 602. And as to alleged non-conformity of the cheese, the testimony is based on hearsay and otherwise precluded as a matter of law for the reasons to be set forth in DS's forthcoming *in limine* motion. DS-Concept also objects to Gellert testifying about Mazzella purportedly seeking his permission regarding a business opportunity with Gourmet concerning mizithra cheese. Such testimony is irrelevant to the claims and defenses under Fed. R. Evid. 401 and, even if tangentially relevant, its probative value is substantially outweighed by the danger of confusing the issues, misleading the jury, and wasting time under Fed. R. Evid. 403.

ii.   **John Rodger.** DS-Concept objects to John Rodger being called as a witness to testify as to Atalanta's purported course of conduct in its relationship with Gourmet, including conditions precedent to Atalanta's payment for cheese, Atalanta's right to cancel Gourmet cheese orders, and timeline for payment of Gourmet invoices. Rodger does not have personal knowledge of these matters and his testimony is therefore precluded under Fed. R. Evid. 602. DS-Concept also objects to Atalanta reading in Rodger's deposition testimony if he testifies at trial because he would not qualify under Fed. R. Civ. P. 32(a)(4)(B) and does not qualify does not qualify under Fed. R. Civ. P. 32(a)(3). If, notwithstanding Atalanta's identification of Rodger as their witness, he declines to testify at trial, then DS-Concept reserves its rights to read in his deposition testimony under Fed. R. Civ. P. 32(a)(4)(B) because he resides in Florida.

iii.   **Marlene Hampton.** DS-Concept objects to Marlen Hampton being called as a witness to testify as to whether the Pecorino cheese represented by the 14 Invoices was conforming or non-conforming to Atalanta's purported requirements for Pecorino cheese. Hampton does not have personal knowledge of this matter and her testimony is therefore precluded under Fed. R. Evid. 602. This testimony is based on hearsay and otherwise precluded a matter of law for the reasons to be set forth in DS-Concept's forthcoming *in limine* motion.

iv.   **Thomas DeCarlo.** DS-Concept objects to Marlen Hampton being called as a witness to testify on any matter related to damages. DeCarlo does not have personal knowledge of these matters and his testimony is therefore precluded under Fed. R. Evid. 602.

v.   **Sewar Nasser, Sadina Atchison, Mary Smith, and Salvatore Mazzella.** DS-Concept objects to Atalanta reading in deposition testimony of these witnesses in lieu of or in addition to their live testimony at trial because such read-ins are not permitted under Fed. R. Civ. P. 32(a)(3) given their positions/status and no other grounds apply under Fed. R. Civ. P. 32(a)(4). DS-Concept reserves its right to read in deposition testimony of these witnesses should any of these witnesses become unavailable within the meaning of Fed. R. Civ. P. 32(a)(4).

    vi.    **John Bettex.** DS-Concept objects to Atalanta reading in deposition testimony of Bettex in lieu of or in addition to his live testimony at trial because he will be a witness at trial, such read-ins are not permitted under Fed. R. Civ. P. 32(a)(3), and no other grounds apply under Fed. R. Civ. P. 32(a)(4). DS-Concept reserves its right to read in deposition testimony of Bettex should he become unavailable within the meaning of Fed. R. Civ. P. 32(a)(4).

**12.**    **Expert and Specialized Lay Opinion Witnesses**

    A.    DS-Concept's expert and specialized lay opinion witnesses are:

        i.    John La Lota (a summary of his expert qualifications and a copy of his Expert Report will be provided at the pretrial conference).

    B.    Atalanta's objection to the qualification of DS-Concept's experts and specialized witnesses are:

        i.    Atalanta has no objections to the qualifications of Mr. La Lota but reserves the right to challenge Mr. La Lota's credibility or otherwise impeach his testimony at trial.

        ii.    Atalanta further submits that, because Mr. La Lota was designated only as a responsive expert and did not submit any affirmative report, his testimony should be precluded if the Court grants Plaintiff's *Daubert* motion to preclude the testimony of Atalanta's factoring expert, Don Coker.

    C.    Atalanta's expert and specialized lay opinion witnesses are:

        i.    **Rosemary Coates**. Ms. Coates is an expert in international maritime shipping practices, procedures, and related documentation and the importation of goods and related documentation as they relate to the practices of the United States Customs and Border Protection policy and procedure. A full recitation of Ms. Coates' qualifications and opinion is set forth in her expert report and disclosure, which has been previously served on Plaintiff and which will be provided if the Court so requests at the pretrial conference.

        ii.    **Don Coker**. Mr. Coker is an expert in accounts receivable finance/factoring and the related documentation and industry customs, practices, and procedures. A full recitation of Mr. Coker's qualifications and opinion is set forth in his expert report and disclosure, as well as the declaration Mr. Coker provided in response to Plaintiff's previously filed and withdrawn *Daubert* motion to exclude his opinions, all of which has been timely served on Plaintiff and which will be provided if the Court so requests at the pretrial conference.

D.   DS-Concept's objections to the qualifications of the Atalanta's experts and specialized lay opinion witnesses are:

i.   **Don Coker.** DS objects to the expert qualifications of Atalanta expert witness Don Coker.  As will be further set forth in DS's *Daubert* motion, Mr. Coker does not have the requisite expertise and knowledge of the factoring industry to opine on the industry customs, standards, and related issues regarding notices of assignment. His lack of requisite and timely expertise is evident from both his expert report/CV and his expert deposition.

## 13.   **DS-Concept's Depositions**[3]

A.   On liability, DS-Concept intends to read into evidence the following:

**Collantes**

| | | | |
|---|---|---|---|
| T35:13-T36:20 | T48:9-T49:19 | T66:17-T68:13 | T94:9-13 |
| T23:21-24 | T52:18-T53:3 | T74:11-T75:15 | T96:16-T97:3 |
| T38:19-T40:13 | T53:17-T54:1 | T78:1-7 | T97:13-18 |
| T42:4-9 | T61:4-25 | T81:20-T86:17 | T98:3-8 |
| T45:2-20 | T62:2-T64:18 | T87:6-T91:15 | |
| T47:14-23 | T65:13-T67:15 | T91:16-20 | |

**DeCarlo**

| | | | |
|---|---|---|---|
| T101:7-T103:7 | T50:12-13 | T68:5-23 | T87:9-15 |
| T131:16-T132:1 | T52:23-T54:11 | T69:25-T71:8 | T89:4-7 |
| T125-T126:21 | T55:9-12 | T75:14-21 | T95:9-11 |
| T143:13-16 | T57:4-15 | T76:1-T77:5 | T98:1-T100:25 |
| T19:5-7 | T66:2-T67:9 | T77:11-22 | |
| T49:23-T50:6 | T67:10-T68:4 | T85:5-T87:8 | |

**Gellert**

| | | | |
|---|---|---|---|
| T62:22-T63:17 | T36:4-20 | T72:4-22 | T144:3-15 |
| T85:8-T86:1 | T40:16-22 | T139:21-T141:1 | T147:15-19 |
| T247:17-24 | T61:7-T62:9 | T141:6-12 | T54:6-23 |
| T34:12-T35:3 | T70:18-23 | T145:11-23 | |

**Jikovsky – 4/3/17**

T9:14-T10:22

---

[3] The parties reserve the right to object to any of their opposing party's proposed deposition read-ins.

**Jikovsky – 4/4/17**

| | | | |
|---|---|---|---|
| T38:18-T42:9 | T44:8-T46:3 | T97:5-T99:7 | T148:9-T149:5 |
| T44:8-T45:10 | T46:6-T47:16 | T102:13-T105:25 | T149:9-T150:16 |
| T8:9-9:3 | T68:11-T70:24 | T106:21-T109:25 | T151:9-T153:5 |
| T9:14-T10:22 | T71:3-5 | T110:21-T111:3 | T173:7-T175:20 |
| T24:9-12 | T73:22-T74:2 | T111:12-21 | T178:10-T179:16 |
| T33:4-7 | T87:12-25 | T112:99-T113:8 | T190:23-T193:10 |
| T33:16-T34:9 | T89:10-T90:2 | T115:10-19 | T193:8-T94:21 |
| T34:10-T35:8 | T90:15-23 | T115:25-T140:23 | |
| T37:17-T36:3 | T93:16-25 | T142:9-T143:16 | |
| T38:8-T42:2 | T95:2-12 | T145:7-17 | |

**Rodger**

T33:14-25
T35:1-6
T47:1-10
T53:11-T54:4
T53:7-10
T54:10-14
T54:20-T55:7
T55:8-T56:1
T56:10-T57:24
T56:2-9
T57:25-T58:21
T60:1-T61:15
T61:16-T63:11
T63:15-23
T76:3-11
T77:7-20
T79:23-T80:18
T80:19-T82:15
T82:4-15
T84:6-21
T85:12-19
T86:21-T87:4
T86:8-11

**Sorahan**

T38:10-13
T38:22-T39:15
T52:18-25
T52:2-5
T52:25-T53:18
T53:20-T54:11
T65:3-T66:22
T66:25-T67:16
T67:17-21
T68:4-T69:1
T70:23-T71:12
T71:22-T73:1
T71:3-6
T74:10-T80:13
T81:6-T83:4
T83:5-T88:2
T95:22-T96:1
T96:9-15
T96:16-20
T96:22-25

**Perego**

T34:12-35:4
T35:20-14
T37:15-38:8
T39:20-41:21
T47:8-22
T51:14-20
T56:7-58:8
T59:12-60:3
T60:12-61:17

     **B.**     On damages, DS-Concept intends to read into evidence the following:

**DeCarlo**

T125:14-126:21

**Gellert**

T245:6-248:19

45

**14.**     **Atalanta's Depositions**[4]

A.     On liability, Defendant intends to read into evidence – or, to the extent the deponent's deposition was videotaped, play – the following:

| Witness | Designation |
| --- | --- |
| John Rodger | pp. 16:8-24, 23:14-17, 33:14-34:2, 35:1-18, 36:3-10, 36:23-25, 37:12-20, 38:5-15, 38:18-19, 42:23-43:1, 43:3-6, 43:8-45:5, 45:11-19, 46:21-25, 126:22-24, 127:16-25, 128:25-130:9, 130:13-19, 135:9-136:5, 136:13-138:1. |
| Ansgar Hütten | pp. 7:12-16, 12-18-13:7, 13:18-22, 14:3-9, 15:10-17:14, 48:4-49:3, 52:15-53:2, 53:19-24, 54:18-55:8, 56:16-58:17, 58:23-59:2, 59:17-62:24, 66:17-23, 68:3-69:13, 70:13-71:2, 71:24-72:9, 73:22-74:19, 74:25-75:10, 77:15-20, 77:24, 79:3-18, 79:20-80:5, 83:4-8, 83:25-85:20, 85:24-86:12, 87:20-89:12, 89:19-25, 90:17-20, 91:10-92:2, 92:22-93:5, 93:10-21, 94:4-95:6, 95:9-19, 92:23-97:11, 97:17-21, 98:8-99:23, 107:9-12, 107:21-108:2, 108:6-109:23, 110:3, 110:9-111:17, 112:8-15, 126:13-127:10, 127:14-129:16, 133:14-134:24, 135:5-11, 135:14-25, 136:16-137:3, 137:19-138:6, 138:22-139:9, 139:17-140:3, 140:16-24, 142:4-10, 142:13-143:12, 143:16-145:8, 145:25-147:16, 155:11-156:12, 161:4-163:3, 163:21-166:8, 167:7-10, 167:24-168:22, 169:2-174:10, 177:17-179:5, 179:11-180:7, 181:4-20, 181:24-182:2, 182:12-183:7, 183:20-23, 184:2-185:8, 185:13-186:9, 192:14-22, 193:16-194:5, 196:4-197:22, 200:22-201:16, 212:10-213:13, 214:21-215:3, 215:12-218:11, 221:9-222:3, 225:11-226:21, 229:18-230:7, 230:12, 232:13-21, 232:23-233:4, 233:21-234:20, 236:20-238:8-10, 239:3-240:17, 241:10-243:20, 246:12-251:5, 264:3-7, 264:10, 264:23-265:23, 266:2-268:25, 269:4, 269:14-271:4, 272:6-9, 274:6-275:22, 277:6-278:14, 282:21-284:17, 284:20, 285:4-18, 286:17-287:12, 289:8-290:9, 291:12-294:11, 295:25-296:5, 296:10-297:9, 297:20-298:14, 298:24-25, 299:7-300:6, 300:12-301:11, 301:19-303:12, 305:20-306:14, 306:22-25, 315:21-316:8, 318:5-11, 320:2-321:13, 323:22-324:9, 326:19-327:20, 333:2-334:3, 334:6-335:9, |

---

[4] Atalanta reserves the right to call these identified witnesses at trial, where they will testify in conformity with their deposition testimony and such other matters that may develop at trial, and sets forth the following designations should Atalanta choose instead to read or play such witness' deposition into evidence. Additionally, in the event the Court denies Atalanta's motion to exclude the use of Mazzella's deposition testimony at trial, Atalanta will designate this testimony as to liability and damages, as appropriate, at such time and before trial, and hereby reserves the right to call Mazzella at trial.

| Witness | Designation |
|---|---|
|  | 335:22-337:9, 337:19-338:12, 340:10-19, 340:22, 343:21-344:5, 348:18-349:7, 349:10-350:12, 350:18-351:18, 353:11-354:4, 354:8-355:17, 355:22-23, 356:2, 361:13-19. |
| Traian "Tim" Jikovski (Volume I, April 3-4, 2017)[5] | pp. 29:8-13, 31:16-32:2, 32:10-33:17, 34:3-8, 36:7-12, 40:3-5, 46:9-20, 48:12-21, 64:11-65:21, 66:9-67:8, 67:20-69:11, 69:19-24, 71:18-72:15, 73:15-74:8, 74:14-75:3, 75:24-76:2, 76:11-19, 77:18-21, 78:14-17, 80:7-10, 80:13-81:3, 81:9-15, 82:13-16, 82:19-84:7, 85:4-20, 86:25-88:1, 88:5-88:9, 88:14-88:20, 88:24-90:10, 91:2-91:16, 92:14-94:3, 94:16-95:2, 95:6-24, 96:2-6, 99:10-100:8, 101:12-102:17, 103:11-104:20, 104:24-106:19, 119:12-14, 119:24-25, 126:13-127:20, 127:24-128:7, 132:16-20, 133:5-20, 134:8-17, 134:21-135:8, 141:22-142:2, 153:2-154:2, 154:5-6, 159:22-160:7, 161:7-11, 161:15-162:5, 163:10-15, 163:18-22, 164:5-165:2, 165:9-14, 166:1-13, 172:2-5, 172:8, 172:14-174:4, 174:19-24, 179:17-18, 179:24-180:5, 180:9-24, 181:8-17, 182:5-18, 213:8-9, 214:9, 214:12-14, 215:10-23, 234:24-25, 241:4-12, 243:9-244:3, 246:18-248:15, 250:3-23, 252:8-253:16, 289:2-290:1, 293:13-294:6, 297:20-23, 298:7-17, 312:15-313:20, 314:4-317:19, 317:25- 318:1, 318:23-319:13, 319:16-21, 323:17-327:23, 328:2-20; 352:19-353:5, 353:10-354:10, 354:15-22, 355:6-25, 356:4-357:2, 360:5-10. |
| Traian "Tim" Jikovski (Volume II, April 4, 2017) | pp. 27:9-19, 28:9-14, 30:11-18, 33:4-7, 39:8-24, 40:2-3, 40:8-18, 40:25-41:2-6, 45:15-45:21, 74:23-75:2, 153:7-154:2, 154:7-156:8, 156:24-157:6, 180:2-4, 180:9-12, 181:20-181:24, 182:3-183:12, 185:12-15, 200:9-13. |
| Traian "Tim" Jikovski (January 11, 2018) | pp. 37:6-25, 38:4-18, 39:24-42:9, 58:19-25, 73:14-74:11, 74:22-76:10, 77:23-78:4, 80:6-17, 80:21-82:10, 96:5-97:3, 101:9-21, 101:25-102:22, 103:17-22, 119:17-120:15. |
| Boris Tzvetanov | pp. 5:16-22, 8:15-19, 13:16-19, 15:14-15, 15:18-21, 16:6-17:7, 20:5-8, 20:11-21:12, 22:13-17, 22;20-24:12, 25:19-29:5, 30:22-25, 40:12-22, 41:12-42:10, 73:5-21, 78:2-5, 78:9-83:24, 84:21-86:11, 87:20-88:15, 89:10-21, 90:2-12, 90:19-92:14, 124:11-126:7, 126:15-130:24, 131:4-134:17, 134:23-135:2, 136:11-137:5, 137:19-139:4, 139:13-139:25, 140:17-142:8, 150:18-152:16, 153:23-154:13, 155:3-156:7, 156:22-157:6, 157:15-18, 159:7-23, 160:5- |

---

[5] Atalanta sets forth the designations for Jikovski as to liability and damages so that they are preserved in the event the Court denies its motion to exclude the use of Jikovski's deposition testimony at trial.

| | |
|---|---|
| | 14, 163:3-17,175:23-176:15,180:4-181:13, 183:10-184:16, 186:5-19, 187:24-188:4, 188:13-190:16, 190:21-192:9, 197:17-199:3, 199:18-202:12, 203:22-206:9, 210:15-211:21, 212:7-215:10, 215:18-216:24, 217:14-218:17, 219:10-13, 219:16-220:13, 220:21-222:7, 225:17-22, 227:18-228:8, 228:13-233:3, 233:18-236:6, 238:8-239:24, 242:5-8, 242:19-244:7, 245:16-253:23, 254:19-23, 255:2-257:21, 260:8-15, 261:8-262:3, 262:18-264:11, 264:21-24, 265:4-273:13, 273:24-274:7, 275:24-276:22, 277:6-11, 277:24-278:3, 278:13-279:23, 280:3-13, 280:20-285:25, 286:5-289:15, 290:2-292:8, 294:7-15, 295:6-19, 296:4-301:25, 302:11-19, 303:3-21, 304:15-305:24, 306:2-308:10, 311:6-314:3, 314:21-316:9, 317:13-320:3, 321:11-322:18, 322:22-323:2, 323:18-324:11, 324:19-25, 327:17-329:21, 330:23-331:12, 331:21-336:6, 336:12-339:15, 339:25-340:18, 340:22-342:5, 344:7-344:23, 345:12-347:19, 348:22-352:5, 352:23-357:21, 358:3-359:24; 420:8-10, 420:13-16, 421:2-10, 421:14-424:22, 426:23-427:25, 429:10-432:6, 433:17-434:9, 434:14-17, 434: 24-435:4, 436:4-8, 438:21-25, 439:7, 451:18-20, 452:9-454:19, 455:2-4, 455:7, 455:15-18, 457:21-458:18, 459:12-24, 460:5-12, 460:21-24, 461:2-10, 467:2-16, 468:3-11, 470:24-471:6, 472:7-14, 473:3-15, 474:10-22, 476:7-9, 477:7-9, 477:23-25, 478:19-479:5, 479:19-480:7, 480:24-481:2, 481:20-482:4, 483:6-10, 484:8-485:14, 495:17-22, 496:20-497:3, 500:2-8, 501:3-5, 9-16, 501:20-502:3, 502:15-22, 509:12-18, 511:21-512:5. |
| John Bettex | pp. 17:14-21:5, 23:14-23:25, 24:8-25:9, 25:16-26;7, 29:20-21, 29:24-25, 35:21-37:21, 38:17-39:21, 43:22-44:9, 45:14-46:5, 64:17-65:5, 65:23-66:8, 69:5-9, 76:18-77:25, 78:8-14, 78:17-81:6, 81:18-82:18, 86:15-88:7, 88:10-14, 89:3-24, 96:21-23, 97:5-11, 97:14-19, 98:9-99:15, 100:9-11, 100:14-101:10, 113:3-9, 113:12-13, 114:22-25, 115:4-18, 116:6-12, 116:16-23, 122:22-123:19, 128:2-24, 129:2-7, 131:8-11, 131:17-23, 133:11-20, 133:22, 133:25-134:9, 134:25-135:5, 135:9-24, 136:3-8, 137:23-138:4, 138:6-139:2, 139:5-11, 139:17-24, 143:24-144:8, 151:10-152:10, 152:17-23, 152:25-153:7, 153:16-21, 153:23-154:6, 155:20-156:4, 156:8-14, 156:22-158:13, 159:12-14, 159:17-160:4, 160:9, 167:7-9, 167:11-168:4, 180:23-181:3, 182:17-24, 183:3-6, 183:9-17, 186:19-25, 188:13-14, 188:16-19, 188:22-189:21, 190:7-9, 190:14-17, 191:15-192:3,199:5-10, 199:12-13, 199:15-19, 200:3-7, 200:10-12, 202:5-21, 203:4-7, 203:18-22, 204:2-3, 204:8-20, 204:24-205:3, 205:5-19, 242:25-243:23, 243:25, |

48

| | |
|---|---|
| | 253:23-254:2, 254:5-20, 254:22-256:9, 256:18-257:20, 258:3-259:8, 259:15-21, 259:23-260:21, 261:19-262:7, 262:15-263:4, 267:17-269:15, 269:19-272:4, 272:7-15, 272:24-273:11, 273:13-274:17, 283:13-285:21, 285:23-286:11, 286:22-287:23, 288:3-289:13, 289:24-290:13, 291:13-18, 292:4-295:5, 295:8-297:19, 307:17-22, 308:9-310:16, 310:18-312:4, 312:19-313:12, 313:20-23, 314:3-23, 315:2-19, 315:25-318:6, 319:20-321:11, 322:14-21, 323:2-4, 323:9-324:11, 327:11-329:13, 330:8-331:25. |
| Mary Smith | pp. 7:15-23, 10:19-11:3, 12:5-13:15, 14:14-15:24, 16:12-18, 17:13-22, 18:2-8, 20:13-15, 21:14-24:20, 25:21-26:8, 26:18-27:5, 28:10-29:12, 38:9-39:21, 40:6-41:21, 42:16-43:10, 47:18-48:18, 48:23-51:2, 51:12-52:17, 52:25-53:4, 54:2-16, 57:3-58:13, 58:16-60:2, 60:5-10, 60:13, 60:16-18, 61:11-15, 61:25-62:11, 63:9-64:9, 65:13-67:1, 67:7-68:20, 69:4-15, 69:21-23, 71:4-10, 71:21-73:9, 74:19-75:22, 77:17-78:3, 78:15-79:16, 79:21-81:17, 91:2-93:10, 95:2-15, 96:8-98:20, 99:2-100:5, 100:13-21, 102:2-14, 104:16-106:4, 106:9-19, 108:7-109:18, 125:4-132:22, 133:10-134:11, 134:18-136:10, 136:25-137:11, 137:16-139:11, 141:14-145:15, 149:12-153:3, 153:18-159:3, 159:21-161:24, 162:2-6, 162:9-11, 162:18-165:22, 166:6-16, 166:21-167:11, 179:9-19, 180:2-10, 181:7-15, 181:18-182:5, 182:21-183:17, 184:10-14, 184:17-185:16, 187:8-190:21, 198:20-199:15, 215:15-218:24, 223:9-13, 223:16-225:12, 225:15-20, 238:10-1, 240:12, 245:9-13, 245:20-246:22, 253:9-254:2, 254:6-255:2, 255:9-256:8, 256:15-260:20, 267:22-273:20, 274:4-9, 274:20-277:20, 280:3-282:19, 286:2-288:21, 291:18-296:13, 299:10-302:7, 308:2-313:19, 314:23-315:20, 323:14-327:5, 327:14-329:6, 330:22-332:3. |
| Denisse Mieles | pp. 14:12-15:4, 15:18-16:11, 16:19-17:8, 23:2-4, 23:11-22, 25:24-26:13, 27:6-28:7, 28:19-30:9, 30:21-31:3, 31:7-14, 32:2-9, 32:21-34:9, 34:11-35:12, 35:15-36:10, 36:12-16, 37:3-4, 37:7-21, 37:23-38:1, 38:3-4, 38:7-11, 38:14-16, 38:19-22, 38:24-39:16, 39:22, 40:15-19, 40:22-24, 41:2-42:5, 42:7-10, 42:13-18, 43:17-23, 43:25-44:7, 49:12-15, 49:17-22, 50:1-51:11, 52:6-13, 53:18-54:6, 54:12-25, 55:2, 55:11-13, 55:15-56:5, 56:20-23, 56:25-57:14, 81:11-82:7, 82:9-82:25, 83:4-22, 84:5-14, 84:20-24, 85:2-7, 85:10-14, 85:19-86:1, 92:21-94:2, 94:4-95:17, 95:19-96:7, 96:9, 96:12-15, 96:18, 96:23-97:1, 97:4-9, 97:11-14, 97:17-19, 97:21, 98:17-99:6, 99:8, 100:16-19, 100:23-101:3, 101:8-102:6, 102:8-16, 102:18, 118:7-9, 118:11-21, 119:3-7, 119:9, 120:8-24, 121:1-10, 121:23-122:10, 125:16-18, |

4884-3141-4357, v. 1

| | |
|---|---|
| | 125:20-126:10, 126:14-127:16, 128:5-9, 128:13-16, 128:19-20, 129:10-13, 129:19-21, 129:25-130:21, 130:24-131:1, 131:10-133:21, 133:24, 134:12-21, 134:23, 135:8-20,136:21-137:10, 137:14-15, 137:18. |
| Sewar Nasser | pp. 12:13-25, 13:3-4, 13:12-21, 14:4-10, 14:15-22, 16:2-8, 16:24-18:12, 18:16-19:4, 20:11-15, 22:3-8, 23:2-22, 24:1-8, 28:9-29:19, 29:25-30:10, 30:12-15, 30:18-23, 31:1-32:5, 32:15-33:14, 33:23-34:3, 34:13-17, 35:10-13, 35:24-36:5, 36:20-25, 38:25-39:11, 39:18-40:15, 40:20-41:1, 41:12-42:8, 42:13-19, 42:23-43:2, 45:2-20, 46:3-10, 48:17-49:11, 50:7-16, 50:19-22, 51:3-9, 62:22-64:25, 65:7-16, 66:1-23, 67:5-12, 67:15. |
| Stella International (by Guido Perego) | pp. 12:5-21, 12:24-13:3, 13:6-16, 14:1-8, 14:15-24, 15:4-23, 16:11-19, 17:3-18:17, 18:23-19:13, 19:19-20:1, 20:6-21, 21:15-23:21, 24:1-25:20, 26:16-17, 26:20-29:22, 30:9-31:10, 31:25-32:2, 32:5-8, 32:10-20, 34:4-7, 34:15-40:3, 40:5-41:16, 41:18-42:3, 42:20-44:8, 44:11-46:7, 46:19-47:6, 47:8-22, 48:2-49:3, 49:6-17, 50:1-52:11, 52:14-53:2, 53:5-55:7, 55:17-57:11, 57:21-58:8, 59:12-60:21, 60:25-61:17, 61:21-22, 62:4-63:8, 63:20-64:18, 64:21-66:2, 66:4-68:7, 68:13-16, 68:18-25, 69:2-70:12, 71:13-73:11, 73:17-74:2, 74:4-22, 75:4-5, 76:22-77:6, 77:17-22, 78:1-7, 78:9-23, 79:1-3, 79:12-24, 80:1-9, 82:1-21, 82:23-83:7, 84:2-85:14, 85:16-86:13, 86:15-87:3, 89:2-7, 89:10-90:2, 90:4-8, 90:10, 90:13-21, 90:23-90:25, 91:2-92:23, 93:8-20, 93:22-94:2, 94:5-10, 94:12-95:18, 96:15-98:5, 98:12-17,98:23-99:12, 99:22-100:20, 101:1-9, 101:11-20, 101:22-102:19, 102:23, -103:5, 103:8-105:4, 105:6-15, 105:17-106:1, 106:12-13, 106:15-16, 107:2-108:19, 108:22-109:4110:2-6, 110:10-11, 110:16-111:10, 111:12-14, 111:19-112:024, 112:5-24, 113:1-5, 119:2—14, 119:18, 160:3-6, 160:10-161:7. |
| Morgan-Todt, Inc (by Clint Morgan) | pp. 8:21-23, 15:25-16:4, 17:2-7, 17:13-19:8, 19:17-23, 20:4-17, 21:5-22:8, 23:3-12, 23:15-18, 23:24-24:16, 24:19-26:12, 26:19-27:22, 29:4-20, 30:8-11, 30:18-22, 30:25, 31:3-4, 31:7-32:6, 33:9-19, 33:25-34:5, 34:18-19, 34:22-35:3, 35:17-37:16, 37:20-38:14, 39:21-40:15, 40:20-41:2, 43:3-44:10, 44:12-15, 44:17, 44:19-25, 45:7-46:3, 46:8-11, 46:13-23, 47:1-4, 47:6-7, 47:9-22, 48:5-49:2, 49:4-8, 49:11-19, 49:23-50:7, 50:13-18, 51:1-7, 51:9-13, 51:15-22, 52:2-9, 52:12-13, 53:6-13, 53:15-23, 54:1-23, 55:1-10, 55:13-16, 57:1-5, 57:7-13, 57;17-58:9, 58:16-20, 58:23-59:17, 59:19-60:7, 60:10-16, 60:19-25, 61:5-10, 61:13-20, 61:23-63:12, 64:20-25, 65:11-25, 66:2-5, 66:11-13, 66:22-25, 67:4-5, 71:10-19, 71:25-72:14, 72:24-76:5, 76:8-10, |

| | |
|---|---|
| | 76:13-19, 76:21-78:14,  78:20-79:3, 79:21-80:17, 81:4-14, 81:19-82:13, 82:20-83:1, 83:21-25, 84:9-11, 84:14, 84:17-22,  85:21-87:2, 87:13-88:23, 88:25-90:25, 91:2-4, 91:8-9, 91:13-24, 92:20-93:2, 93:6-94:3, 94:5-7, 94:11-22, 94:25-95:11, 98:21-23, 99:3-13, 99:16-21, 99:24, 100:13-100:25, 101:18-102:9, 102:14-103:1, 103:3-19, 105:15-25, 115:4-19, 117:25-118:24, 119:2-3, 119:8-15, 119:18-21, 120:1-5, 120:8, 121:8-25. |
| Geneva    Refrigerated Truck  Service  Inc.  & Growers'   Refrigeration (by Kevin Baumsteiger) | pp.  17:5-15,  19:2-20:5,  20:12-21,  23:6-27:5,  27:8-12, 27:16-20, 28:6-18, 29:6-13, 30:14-22, 30:24-25, 31:2-33:3, 33:10-34:2035:9-13,   36:6-42:3,   42:15-43:10,43:14-23, 43:25-44:12,  44:15-48:25,  50:5-15,  50:19-52:25,  53:6-54:1, 54:4-55:14, 55:18-56:6, 56:10-57:3, 57:6-20, 57:23-58:10, 58:13-16, 58:18,-59:4, 59:7-12, 59:22-25, 60:12-13, 60:16-67:10,   67:15-69:10,   69:13-74:10,   74:16-77:15, 77:17-77:24, 78:5-6, 78:19-79:3, 79:6-81:8, 81:22-82:4, 82:9-86:21, 87:1-91:23, 91:25-92:6, 92:9-93:24, 94:3-24, 95:2-101:21,   101:24-103:17,   103:23-104:19,   104:23-107:10, 107:13-108:7, 108:12-14, 108:17-109:4, 109:7-10, 110:21-111:17, 111:25, 112:10, 113:2-5, 113:18-117:25, 118:10-120:23,    121:1,    121:7-122:6,122:25-123:22, 123:25124:9, 124:21-126:12, 126:24-127:1, 127:7-128:14, 128:18-23,  128:25-129:3,  129:6-7,  129:11-20,  130:1-131:18, 132:4-133:10, 133:16-18, 133:21-25, 136:2-140:2, 140:12-21, 141:12-152:20, 154:11-155:13, 155:17-159:22, 160:3-12,  160:17-162:14,  162:21-163:5,  163:13-165:9, 165:12-166:3,   166:6-14, 166:16-168:19, 168:23-169:1, 169:3-21, 169:23-173:25, 178:5-8, 178:12-179:13, 179:18-19, 179:24-181:17, 182:21-25, 183:3-15, 183:20-184:12, 184:14-187:24, 188:2-7, 188:10, 190:16-19, 190:23-191:2, 191:14-18, 191:21-24, 192:2-7, 193:6-14, 193:21-194:5, 218:25-219:19, 219:22-24. |
| Sadina Atchison | pp.  7:7-12,  18:25-19:5,  32:15-17,  33:18-19,  33:21-34:4, 34:19-25,  43:1-14,  43:21-25,  69:16-70:22,  74:12-17, 108:20-109:1, 109:21-110:4, 110:4, 113:11-114:6, 114:12-16,  115:8-116:1,  116:9-117:6,  119:2-5,  119:11-120:5, 121:18-122:9,   126:6-12,   126:18-128:13,   129:12-15, 129:18-130:14, 139:24-140:13, 211:22-212:4, 212:6-15, 212:22-214:17219:9-11, 219:24-220:5, 221:5-8, 241:3-6, 241:9-242:22, 243:4-6, 244:15, 244:23-245:20, 245:25-248:8, 249:23-250:25, 251:5-253:2, 253:9-23, 254:6-19, 255:16-21,   256:3-257:5,   258:10-18,   258:25-259:11, 259:14-260:22, 261:1-10, 261:18-24. |

51

| Sal Mazzella | pp. 6:6-14, 8:17-9:3, 9:6-23, 10:14-16, 13:4-5, 13:9-19, 13:22-23, 13:25-14:8, 14:22-15:2, 16:8-19, 20:8-10, 21:14-18, 21:20-22:9, 55:14-16, 55:19-24, 56:9-14, 56:16-23, 56:25, 57:2, 104:4-18, 104:23-105-1, 105:3-6, 105:8-19, 106:5-13, 106:24-107:1, 107:19-108:9, 108:14-25, 109:13-25, 110:2-5, 112:13-113:5, 148:10-149:2, 149:19-21, 150:8-151:10, 152:23-153:13, 164:10-18, 174:17-21, 175:4-22, 176:5-8, 176:10-177:1, 177:10-178:7, 179:11-16, 180:4-14, 181:13-182:18, 182:24-183:2, 184:13-185:8, 189:7-16, 191:3-192:10, 192:19-21, 193:2-194:11, 194:14-195:2, 195:9-196:5, 198:15-25, 199:22-25, 200:4-6, 204:11-14, 204:16-205:2. |

      B.      On damages, Defendant intends to read – or, to the extent the deponent's deposition was videotaped, play – into evidence the following:

| Witness | Designation |
|---|---|
| John Bettex | pp. 137:14-138:24;  202:5-203:7;  203:18-22;  204:11-20;  286:22-287:11. |
| Ansgar Hütten | pp. 282:21-284:20. |
| Traian "Tim" Jikovski (Volume I, April 3-4, 2017) | pp. 32:12-33:17; 81:9-15; 82:13-84:7; 95:6-18; 106:12-19; 153:2-154:6; 159:22-160:7; 161:7-162:5; 241:4-12; 243:9-244:3; 250:3-23; 252:8-16; 298:7-17. |
| Boris Tzvetanov | pp. 124:11-126:7;  126:15-134:17;  134:23-135:2;  136:11-137:5; 150:19-152:16; 155:3-156:7; 156:22-157:6; 157:15-18; 163:3-17; 264:21-24. |

**15.**    **DS-Concept's Exhibits**

      Except for exhibits the need for which could not reasonably have been foreseen or which are used solely for impeachment purposes, only the exhibits set forth on the exhibit list for Plaintiff and Defendant and attached hereto may be introduced at trial.  Any objection to an exhibit, and the reason for said objection, must be set forth pursuant to the procedure set forth below or it shall be deemed waived.  All parties hereby agree that it will not be necessary to bring in the custodian of any exhibit as to which no such objection is made.

Three (3) weeks after the entry of the Final Pretrial Order, counsel for each party shall serve upon all parties copies of all trial exhibits, fully pre-marked with exhibit tabs and numbering to be utilized at trial.

A.   Plaintiff intends to introduce into evidence the exhibits listed on the attached exhibit list.

B.   Defendant objects to the introduction of Plaintiff's exhibits 1-8, 10-14, 17-51, 53-55.  Defendant further objects to Plaintiff's characterization of the documents set forth in its exhibit list.  Objections shall be provided two weeks before the trial brief is due.

16.   **Atalanta's Exhibits**

A.   Defendant intends to introduce into evidence the exhibits listed on the attached exhibit list.

B.   Plaintiff objects to the introduction of Defendant's exhibits 1-5, 8-10,16-18, 21, 23-30, 32, 34, 36, 38-5, 47-48, 53-54, 57-61, 64-73, 76-98.  Objections shall be provided two weeks before the trial brief is due.

COPIES OF EXHIBITS ARE TO BE MADE FOR OPPOSING COUNSEL, AND A BENCH BOOK OF EXHIBITS IS TO BE DELIVERED TO THE JUDGE ONE WEEK PRIOR TO THE START OF TRIAL. IF COUNSEL DESIRES TO DISPLAY EXHIBITS TO THE JURY, SUFFICIENT COPIES SHOULD BE AVAILABLE TO PROVIDE EACH JUROR WITH A COPY; ALTERNATIVELY, ENLARGED PHOTOGRAPHIC OR PROJECTED COPIES MAY BE USED.

17.   **DS-Concept's Legal Issues**

A.   <u>Legal Issues to be Decided</u>

The legal issues presented by DS are as follows: (1) Whether Atalanta is liable for breach of contract and related common law claims to pay DS on the 14 Invoices?; (2) Whether Atalanta is liable for breach of contract and under UCC 9-406(a) to pay DS on the 11 Direct Payment

Invoices?; and (3) Whether Atalanta is liable for breach of contract and under UCC 9-406(a) to pay DS on the unpaid 2016 Invoices?

   B.     Mazzella's Invocation of the Fifth Amendment Privilege

   An issue exists regarding the testimony of Mazzella and his invocation of the Fifth Amendment privilege against self-incrimination. As the Court may recall from prior motion practice, Mazzella was employed by Atalanta as its Senior Product Manager exclusively responsible for the Gourmet account during the relevant period. He is integral to the events and transactions that form the basis of DS-Concept's claims. At his deposition, Mazzella pled his Fifth Amendment right against self-incrimination and declined to answer any questions. On subsequent motion practice brought by DS-Concept, the Court permitted him to continue to invoke his Fifth Amendment rights and not answer any deposition questions. (ECF 314, 320). DS-Concept intends to call Mazzella as a witness at trial. The Court and parties need to address what will almost certainly be Mazzella's continued invocation of his Fifth Amendment rights on the stand to every question asked, as well as the consequences that flow from it. In particular, DS-Concept intends to ask the Court to instruct the jury that it may draw adverse inferences against Atalanta from Mazzella's refusal to answer questions.

   C.     Recoupment or Set-Off Rights

   Atalanta asserts that it is entitled to recoup the amount of the default judgment it obtained against Gourmet amount against any damages awarded to DS-Concept at trial and that the default judgment eliminates DS-Concept's damages claim. DS-Concept contends that Atlanta does not have any right to recoup the default judgment against the invoices at issue here under the U.C.C. or any such recoupment and setoff rights at common law.  Relatedly, to the extent that the default judgment against Gourmet is inconsistent with the verdict at trial, the appropriate remedy is for

54

the Court to vacate the portion of the default judgment relevant to the claims and invoices at issue at trial.

**18.     Atalanta's Legal Issues**

In addition to the legal issues raised in Atalanta's contemplated motions *in limine*, *see* ¶ 2 above, and set forth in Atalanta's pleadings herein, Atalanta raises the following additional issues:

A.     Choice of Law

Plaintiff asserts seven claims against Atalanta but has not identified any particular state common or statutory law under which it brought these claims. *See* D.E. 109, 243-1. Atalanta submits that it may be necessary for the Court to rule on conflicts-of-laws issues with respect to Plaintiff's claims.

B.     Delivery of Goods

Atalanta submits that (a) the Court's denial of Plaintiff's motion for summary judgment held that Plaintiff's proffered evidence of delivery of the Product was insufficient to establish liability and (b) Plaintiff cannot otherwise prevail on any of its claims against Atalanta under the U.C.C. or the common law that seek payment on the 14 Invoices unless it proves that the goods identified therein were actually tendered for delivery to Atalanta.

C.     Bills of Lading

Atalanta intends to move *in limine* to limit Plaintiff's descriptions of non-negotiable bills of lading in this case as title documents establishing Atalanta's purported ownership of the Product. Should that motion be denied, there remains the legal issue concerning the legal effect of such bills of lading. Atalanta submits that it is well settled that a non-negotiable bill of lading is not a title document and a limiting instruction so stating this should be given to the jury.

D.    Plaintiff's Various Causes of Action on the 14 Invoices

In its Amended Complaint, Plaintiff asserts five causes of action against Atalanta for payment of the 14 Invoices, including breach of contract, *quantum meruit*, account stated, promissory estoppel, and equitable estoppel.  Plaintiff has not pled these claims in the alternative. Atalanta submits these claims are mutually exclusive and, therefore, Plaintiff must elect at the opening of evidence which theory of recovery to pursue.  Additionally, Atalanta submits that Plaintiff's promissory and equitable estoppel claims are identical and cannot be plead alternatively, and in any event deficient, as Plaintiff cannot establish reasonable reliance.

E.    Mazzella's Invocation of the Fifth Amendment

As noted above, Atalanta will seek *in limine* to limit the use of or reference to Mark Mazzella's deposition or invocation of the Fifth Amendment at trial.  Should the Court decline that relief, Atalanta submits that legal issues remain as to the ability of the jury to draw any inferences from Mazzella's testimony.  Atalanta submits that Mazzella's invocation of his rights against self-incrimination does not entitle Plaintiff to an adverse inference against Atalanta.

F.    Plaintiff's Ability to Recover Legal Fees Against Atalanta

Atalanta submits that Plaintiff is not entitled under the U.C.C. or the common law to recover from Atalanta the amount of legal fees and expenses it incurred in obtaining control of the Product, selling the Product, and litigating a negligence matter against a cold-storage facility that allegedly damaged part of the Product.

G.    Atalanta's Recoupment and Setoff Rights

Gourmet and Jikovski are jointly and severally liable to Atalanta on the Gourmet Judgment. Atalanta submits that it is entitled to recoup the judgment amount against any amounts claimed by Plaintiff here and that the Gourmet Judgment wholly eliminates any of Plaintiff's alleged damages.

4884-3141-4357, v. 1

H.   Atalanta's Entitlement for a Credit for Amounts Recovered

As noted herein, Plaintiff recovered certain amounts against the face value of the 14 Invoices.  Additionally, nine of the containers of the Product were placed in frozen storage by Gourmet's cold-storage facility, damaging the Product and reducing its value.  Plaintiff thereafter joined a lawsuit with Gourmet against the cold-storage facility for negligence, which Plaintiff ultimately settled for far less than the market value of the frozen Product at the time it was damaged.  Atalanta submits that, to the extent it is found to have ordered, accepted and/or wrongfully rejected the Product, it is entitled to a credit in the amount of the fair market value of the damaged Product at the time it was damaged and the amounts Plaintiff recovered against the face value of the 14 Invoices.

19.   **Miscellaneous**

As noted herein, at his deposition, Mazzella pled his Fifth Amendment right against self-incrimination and declined to answer any questions.  On subsequent motion practice brought by DS-Concept, the Court permitted him to continue to invoke his Fifth Amendment rights and not answer any deposition questions. (ECF 314, 320). DS-Concept intends to call Mazzella as a witness at trial.  Atalanta has objected to his designation as a trial witness for the reasons stated herein.  Should Atalanta's objection be overruled, and should Mazzella thereafter continue to invoke his Fifth Amendment rights at trial to every question asked, there emerges a legal issue as to the consequences that flow from it.

20.   **Jury Trials**

The following should be submitted to the Court no later than ten (10) days prior to trial:

A.   Each side shall submit to the Judge and to opposing counsel a trial brief or memorandum in accordance with Local Civil Rule 7.2, with citations to authorities and arguments in support of its position on all disputed issues of law.  In the event

57

a brief shall not be filed, the delinquent party's complaint or defense may be stricken.

B.    Counsel shall submit to the Court a joint set of proposed preliminary and final jury instructions. Supplemental requests for instructions as to facts or legal issues that could not reasonably have been anticipated before trial may be submitted at any time prior to argument to the jury. All requests for instructions shall be plainly marked with the name and number of the case, shall contain citations of supporting authorities, if any, and shall designate the party submitting same. In the case of multiple requests by a party, these shall be numbered in sequence and each request shall be on a separate sheet of paper.

C.    Counsel shall jointly submit to the Court a set of proposed *voir dire* questions.

D.    Counsel shall jointly submit to the Court a separate proposed special verdict sheet.

E.    Counsel shall each submit three (3) copies of a separate exhibit list and two bench books of trial exhibits.

F.    Counsel shall jointly provide the Court with a copy of the jury instructions and proposed verdict sheet on a computer disk in a WordPerfect readable format.

**21.    Trial Counsel**

A.    For Plaintiff: Lawrence Weiner, Richard Simon, Robert Scrivo, and Brian Block of Mandelbaum Barrett P.C.

B.    For Defendant: Zachary G. Newman, Steven R. Aquino, and Maia Bartee of Thompson Coburn Hahn & Hessen LLP and Justin T. Quinn of Robinson Miller LLC.

**22.    Bifurcation**

The issues of liability and damages shall not be tried separately.

**23.    Estimated Length of Trial**

Plaintiff estimates the trial will take 12 days for liability and 2 days for damages.

Defendant estimates the trial will take 6 days for liability and 2 days for damages.

AMENDMENTS TO THIS PRETRIAL ORDER WILL NOT BE PERMITTED UNLESS THE COURT DETERMINES THAT MANIFEST INJUSTICE WOULD RESULT IF THE AMENDMENT IS DISALLOWED. THE COURT MAY FROM TIME TO TIME SCHEDULE

CONFERENCES AS MAY BE REQUIRED EITHER ON ITS OWN MOTION OR AT THE

REQUEST OF COUNSEL.


_____

(Attorney for Plaintiff)


_____

(Attorney for Defendant)


s/Cathy L. Waldor 3/15/23
_____

United States Magistrate Judge

Dated:

(EXHIBIT LISTS FOLLOW)

## DS-CONCEPT EXHIBIT LIST

1. The July 29, 2013 Account Receivable Purchase Agreement entered into between Gormet Ltd. and DS-Concept, DS000021-DS000040.

2. The August 5, 2013 Account Receivable Purchase Agreement entered into between Gourmet LLC and DS-Concept, DS000001-DS000020.

3. The Notice of Assignment sent by Gourmet Ltd. to Atalanta, ATL0000322-ATL0000323.

4. The Notice of Assignment sent by Gourmet LLC to Atalanta, ATL0000320-ATL0000321.

5. August 2013 emails to Atalanta and among and between Atalanta executives and employees concerning the Notice of Assignment, ATL0000316-ATL0000327, ATL0000339-ATL0000341, ATL0000345-ATL0000346, ATL0000385-ATL0000386.

6. The August 13, 2013 email sent by Atalanta to Factoring/DS-Concept enclosing the completed Notices of Assignment, DS000333-DS000339.

7. Compendium of documents, including verification emails, approvals for payment and proof of payments detailing DS-Concept's and Atalanta course of conduct from August of 2013 through the end of 2015. Exhibit R to the Declaration of Lawrence C. Weiner, Esq. dated July 15, 2020, ECF Nos. 243-22, 243-23, 243-24.

8. Atalanta's Cheese Department Corporate Chart, ATL007877.

9. Examples of Gourmet Invoices with different payment instructions, ATL0000006, ATL0000010, ATL0000019, ATL0000040, ATL0000077, ATL0000086-ATL0000091, ATL0000093- ATL0000103.

10. Factoring's May 18, 2015 email to Atalanta enclosing Gourmet Invoice No. 59097 and associated bill of lading, DS004823-DS004824, DS004831-DS004832.

11. Compendium of the Direct Payment Invoices. ATL0000086-ATL0000103.

12. June 15, 2015 emails between employees of Atalanta. ATL0004525.

13. June 22, 2015 email from Atalanta to DS-Concept. ATL0004548.

14. Emails exchanged between Gourmet and Atalanta on July 21, 2015, ATL0005226-ATL0005228.

15. Email dated October 11, 2015 from Gourmet to Atalanta, ATL0000092.

4884-3141-4357, v. 1

16. Emails exchanged between Gourmet and Atalanta on December 22 and 23, 2015, ATL0004734-ATL0004735.

17. Compendium of Atalanta Purchase Orders and Gourmet invoices concerning the Post Lawsuit Invoices. ATL0005736-5737, ATL006222, ATL0005740-ATL0005741, ATL006221, ATL0005742-ATL0005743, ATL006223.

18. Examples of Atalanta Purchase Orders, ATL0005562, ATL0003948, ATL0005630-ATL0005631, ATL0005634, ATL0004086, ATL0003996-ATL0003997, ATL0004073- ATL0004075, ATL0004096.

19. Examples of Gourmet sending its invoices and associated bills of lading to Factoring, requesting that Factoring then confirm the invoices with Atalanta, DS004681-DS004682, DS004588.

20. Mazzella's application for employment. ATL0003711-ATL0003714.

21. Mazzella's Exit Interview Questionnaire, ATL0004752- ATL0004756.

22. T. Gellert's December 11, 2015 email to employees of Atalanta, ATL0003694.

23. April 10, 2008 email from John Rodger to all Atalanta employees. ATL0003696.

24. Mazzella's 2015 Pay Statement from Atalanta, ATL0003691-ATL0003692.

25. Atalanta's Purchase Order No. 05-21193. ATL0005644-ATL0005645.

26. Emails exchanged between Factoring and Atalanta on March 24, 2015. DS004817-DS004821.

27. Emails exchanged between Factoring, Atalanta and Gourmet on March 24, 2015 and March 16, 2015. DS000852-DS000853.

28. Emails exchanged between Factoring, Atalanta and Gourmet on March 24, 30 and 31, 2015. DS000856-DS000858.

29. Atalanta Purchase Order No. 05-24954. ATL0000246-ATL0000248.

30. Emails exchanged between Factoring and Atalanta. DS004833-DS004839.

31. Atalanta Purchase Order 05-25721. ATL004086-ATL004088.

32. Emails exchanged between Factoring and Atalanta. DS004841-DS004854.

33. Emails exchanged between Factoring and Atalanta. DS004841-DS004848.

61

34.    Emails exchanged between Atalanta employees. ATL003742-ATL003743

35.    Atalanta's Purchase Order No. 05-25915, ATL0005714.

36.    Compendium of the 14 Invoices with associated verification emails. DS004841-DS004847, DS000151-DS-000177.

37.    Mazzella's December 7, 2015 letter of resignation, ATL0003695.

38.    October 16, 2015 email from Factoring to Atalanta and October 18, 2015 email between Atalanta employees. ATL0005094-ATL0005097.

39.    Emails exchanged between Bettex and Mazzella on November 3 and 4, 2015, DS003423-DS003424.

40.    Emails exchanged between Bettex and Mazzella on November 4 and 6, 2015, DS000323.

41.    Mazzella's November 8, 2015 email to Bettex, DS000322.

42.    Emails between Bettex and Mazzella dated November 12, 16, and 17, 2015 and enclosing a proposed Promissory Note, DS000831-DS000832, DS000348-DS000349.

43.    Emails exchanged between Bettex and Mazzella on November 17, 19 and 20, 2015, DS001261, DS000318.

44.    Emails exchanged between Bettex and Mazzella on December 3 and 4, 2015, DS000318.

45.    Emails exchanged between Bettex and Mazzella on December 3 and December 10, 2015, along with a December 10, 2015 letter from Atalanta, DSM-15 marked at Mazzella Deposition.

46.    Bettex's December 23, 2015 email to Mazzella, attaching a revised Promissory Note, DS000350, DS003226-DS003227.

47.    Bill of Sale from Atalanta dated December 23, 2015 to Gourmet, DS000358.

48.    Emails exchanged between Bettex and Mazzella on December 23 and 28, 2015, MAZZELLA-00037.

49.    DS-Concept's December 28, 2015 filing of a Notification of Overdue Claim with Euler Hermes, DS004588-DS004589.

50.    Emails exchanged between Bettex and Mazzella on December 29, 2015 and Mazzella's email forwarding such communications to Traian ("Tim") Jikovsky, MAZZELLA-00036.

51.     Bettex's December 29, 2015 email to Mazzella and Rodger's December 29, 2015 email to Bettex in response, DS001284.

52.     Mazzella's January 4, 2016 email to Bettex. DS000307.

53.     A business record kept in the normal course memorializing DS-Concept's repurchase of Gourmet's invoices 59107 - 59109. DS005333-DS005338.

54.     A business record kept in the normal course memorializing DS-Concept's repurchase of Gourmet's invoices 59112, 59113, 59114, 59117, 59118, 59119, 59120 and 59121. DS005327-DS5332.

55.     Zachary Newman, Esq.'s November 10, 2017 letter to Tracey Archbold, with enclosures, ATL006438-ATL006928.

56.     U.S. Department of Homeland Security CBP Entry Summaries, STELLA002-003, 017-18, 032-33, 047, 051-052, 065-66, 079-80, 093-094, 107.

## ATALANTA'S EXHIBIT LIST

| Exhibit | Description (Deposition Exhibit/Bates Nos.) |
|---|---|
| DX 1 | Atalanta Deposition Ex. 9; ATL-11 |
| DX 2 | Atalanta Deposition Ex. 11; Compilation: ATL-29-74 |
| DX 3 | Atalanta Deposition Ex. 12; ATL-3946-47 |
| DX 4 | Atalanta Deposition Ex. 13; Gourmet 119-121 |
| DX 5 | Atalanta Deposition Ex. 14; CITI-3-9 (with FRE 902 certification) |
| DX 6 | Atalanta Deposition Ex. 18  Gourmet 76-92 |
| DX 7 | Atalanta Deposition Ex. 19; ATL-3715-22 |
| DX 8 | Atalanta Deposition Ex. 24; CITI-828 (with FRE 902 certification) |
| DX 9 | Atalanta Deposition Ex. 25; Gourmet 219-225 |
| DX 10 | Atalanta Deposition Ex. 31; Gourmet 296 |
| DX 11 | Atalanta Deposition Ex. 32; Gourmet 273 |
| DX 12 | Atalanta Deposition Ex. 34; DS-261-65 |
| DX 13 | Atalanta Deposition Ex. 35; DS-273 |
| DX 14 | Atalanta Deposition Ex. 36; DS-296 |
| DX 15 | Atalanta Deposition Ex. 37; Gourmet 598-606 |
| DX 16 | Atalanta Deposition Ex. 39; ATL-27582 |
| DX 17 | Atalanta Deposition Ex. 47; ATL-4507-09, ATL-4551-52 |
| DX 18 | Atalanta Deposition Ex. 48: ATL-4534-47 |
| DX 19 | Atalanta Deposition Ex. 52; ATL-3742-43 |
| DX 20 | Atalanta Deposition Ex. 53; DS-1393-96 |
| DX 21 | Atalanta Deposition Ex. 60; DS-220-23 |
| DX 22 | Atalanta Deposition Ex. 65; DS-307 |
| DX 23 | Atalanta Deposition Ex. 67 |
| DX 24 | Atalanta Deposition Ex. 69; Wiscon 1-3 (with FRE 902 certification) |
| DX 25 | Atalanta Deposition Ex. 70; Wiscon 56-59 (with FRE 902 certification) |
| DX 26 | Atalanta Deposition Ex. 71; Wiscon 62-66 (with FRE 902 certification) |
| DX 27 | Atalanta Deposition Ex. 72; Wiscon 71-74 (with FRE 902 certification) |
| DX 28 | Atalanta Deposition Ex. 74; Mazzella-36 |
| DX 29 | Atalanta Deposition Ex. 77; ATL-11 |
| DX 30 | Atalanta Deposition Ex. 78; Compilation: ATL-42-DS-1463 |
| DX 31 | Atalanta Deposition Ex. 80; DS672-74 |
| DX 32 | Atalanta Deposition Ex. 81; Gourmet 67, 69 |
| DX 33 | Atalanta Deposition Ex. 82; DS-3574-3608 |
| DX 34 | Atalanta Deposition Ex. 86 [*no Bates numbering*] |
| DX 35 | Atalanta Deposition Ex. 89; DS-824-28 |
| DX 36 | Atalanta Deposition Ex. 92; DS-281-86 |
| DX 37 | Atalanta Deposition Ex. 93; ATL-3935-38 |

64

| Exhibit | Description (Deposition Exhibit/Bates Nos.) |
|---|---|
| DX 38 | Atalanta Deposition Ex. 97; Gourmet 265-70 |
| DX 39 | Atalanta Deposition Ex. 98; Gourmet 265-83 |
| DX 40 | Atalanta Deposition Ex. 100; DS-3549, ATL-6428 |
| DX 41 | Atalanta Deposition Ex. 101; DS-3549 |
| DX 42 | Atalanta Deposition Ex. 102; DS-1208 |
| DX 43 | Atalanta Deposition Ex. 104; DS-287 |
| DX 44 | Atalanta Deposition Ex. 105; DS-4284-4545 |
| DX 45 | Atalanta Deposition Ex. 106; Compilation: DS-2161-3377 |
| DX 46 | Atalanta Deposition Ex. 108; DS-3082 |
| DX 47 | Atalanta Deposition Ex. 109; DS-2231-32 |
| DX 48 | Atalanta Deposition Ex. 110; DS-1883-89 |
| DX 49 | Atalanta Deposition Ex. 111; DS-3102-03 |
| DX 50 | Atalanta Deposition Ex. 113; ATL-7528-7610 |
| DX 51 | Atalanta Deposition Ex. 114; ATL-7120-7273 |
| DX 52 | Atalanta Deposition Ex. 116; DS-4118-4269 |
| DX 53 | Atalanta Deposition Ex. 117; [*not Bates numbered*] |
| DX 54 | Atalanta Deposition Ex. 121; DS-395-396 |
| DX 55 | Atalanta Deposition Ex. 122; DS-1275-80 |
| DX 56 | Atalanta Deposition Ex. 124; DS-665-66 |
| DX 57 | Atalanta Deposition Ex. 125; DS-660 |
| DX 58 | Atalanta Deposition Ex. 126; DS-652-54 |
| DX 59 | Atalanta Deposition Ex. 127; DS-649-51 |
| DX 60 | Atalanta Deposition Ex. 128; Gourmet 847-57 |
| DX 61 | Atalanta Deposition Ex. 130; DS-3613-25 |
| DX 62 | Atalanta Deposition Ex. 131; DS-4924 |
| DX 63 | Atalanta Deposition Ex. 133; DS-4118-4283 |
| DX 64 | Atalanta Deposition Ex. 134; DS-5119-20 |
| DX 65 | Atalanta Deposition Ex. 135; DS-5121-22 |
| DX 66 | Atalanta Deposition Ex. 136; DS-5123-25 |
| DX 67 | Atalanta Deposition Ex. 137; DS-5117-18 |
| DX 68 | Atalanta Deposition Ex. 139; ATL-8115-19 |
| DX 69 | Atalanta Deposition Ex. 141; DS-4642-52 |
| DX 70 | Atalanta Deposition Ex. 142; ATL-303-06 |
| DX 71 | Atalanta Deposition Ex. 143; DS-5119-20 |
| DX 72 | Atalanta Deposition Ex. 144; DS-5121-22 |
| DX 73 | Atalanta Deposition Ex. 145; Compilation: DS-1991-1463 |
| DX 74 | Atalanta Deposition Ex. 157; DS-1101-04 |
| DX 75 | Atalanta Deposition Ex. 158; DS-970-74 |
| DX 76 | ATL-7701-19 |

| Exhibit | Description (Deposition Exhibit/Bates Nos.) |
|---------|---------------------------------------------|
| DX 77 | ATL-8142-48 |
| DX 78 | G&K Sales 20, 26-41 (with FRE 902 certification) |
| DX 79 | GG Deposition Ex. 3; Growers 133-38, DS-3900-04 |
| DX 80 | GG Deposition Ex. 4; ATL-7022, Stella 31-35, ATL-7023, 6965, 7021, 6966 |
| DX 81 | GG Deposition Ex. 5; Growers 7-10, 17, 19-20, 22, 136 |
| DX 82 | GG Deposition Ex. 6; Growers 10-15, 18, 21 |
| DX 83 | GG Deposition Ex. 7; Growers 112 |
| DX 84 | GG Deposition Ex. 8; DS-4067-68 |
| DX 85 | GG Deposition Ex. 9; Growers 130-31, DS-3898-99 |
| DX 86 | Growers 141-48 |
| DX 87 | MT Deposition Ex. 2; MT-4, 10, 17, 24, 32, 42, 47, 56, 62, 66 |
| DX 88 | MT Deposition Ex. 3; ATL-6963, 6966, 6968, 6973, 6976, 6979, 6982, 6984 |
| DX 89 | MT Deposition Ex. 4; DS-824-828 |
| DX 90 | MT Deposition Ex. 6; DS-3941-44 |
| DX 91 | Stella Deposition Ex. 2; Stella 125 |
| DX 92 | Stella Deposition Ex. 3; DS-281-286 |
| DX 93 | Stella Deposition Ex. 4; ATL-3935-3938 |
| DX 94 | Stella Deposition Ex. 5; Stella 13-14, 28-29, 43-44, 62-63, 76-77, 90-91, 104-05, 117-18 |
| DX 95 | Stella Deposition Ex. 6; Stella 120-22, 126 |
| DX 96 | Stella Deposition Ex. 7; Compilation: Stella 1-DS-394 |
| DX 97 | Stella Deposition Ex. 8; Gourmet 265-270 |
| DX 98 | Wiscon 1-3, 46-47, 56-59, 61-66, 68-73, 75-76, 78, 85-88, 90 (with FRE 902 certification) |